Terry Gross, terry@gba-law.com (SBN 103878)
Adam C. Belsky, adam@gba-law.com (SBN 147800)
Monique Alonso, monique@gba-law.com (SBN 127078)
Gross Belsky Alonso LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Tel: (415) 544-0200
Fax: (415) 544-0201

Attorneys for Plaintiff
MAURICE CALDWELL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE CALDWELL<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; KITT CRENSHAW; ARTHUR GERRANS; JAMES CROWLEY; and DOES 1-10, inclusive<br><br>Defendants. | **PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Case No.: 12-cv-1892 EDL<br><br>**(1) DUE PROCESS VIOLATION, 42 U.S.C. §1983;**<br>**(2) JOINT ACTION/ CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. §1983, FABRICATION OF EVIDENCE;**<br>**(3) *MANSON/BIGGERS* VIOLATIONS, 42 U.S.C. §1983;**<br>**(4) JOINT ACTION/ CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. §1983, *MANSON/BIGGERS* VIOLATIONS;**<br>**(5) *MONELL VIOLATIONS*, 42 U.S.C. §1983;**<br>**(8) FAILURE TO INTERVENE, 42 U.S.C. §1983**<br><br>DEMAND FOR JURY TRIAL. |

1

# I.

# JURISDICTION AND VENUE

1.      This action is brought by Plaintiff Maurice Antwone Caldwell ("Plaintiff" or "Caldwell") pursuant to 42 U.S.C. §1983.

2.      This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

3.      The acts and omissions complained of commenced on June 30, 1990, and continued until May 28, 2011, within the Northern District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

# II.

# INTRODUCTION

4.      On September 21, 1990, San Francisco Police officers arrested Plaintiff Maurice Caldwell for the murder of Judy Acosta, a murder for which he has never been lawfully convicted, and the commission of which he has adamantly denied for the past 21 years.  Mr. Caldwell was convicted based upon a single unreliable eyewitness identification obtained by unnecessarily suggestive procedures.  Without this fabricated evidence, Mr. Caldwell would not have been prosecuted or convicted.

5.      Mr. Caldwell spent 20 years in prison as a result of the actions of the San Francisco Police officers who fabricated evidence, manipulated witnesses and employed impermissibly suggestive identification procedures to create evidence against Mr. Caldwell.  The officers' conduct in procuring the conviction of Mr. Caldwell violated his civil and constitutional rights.  In addition, San Francisco Police Department's failure to train its officers was a motivating force behind the violations of Mr. Caldwell's rights.  As a result of Defendants' misconduct, Mr. Caldwell was deprived of the one thing all innocent people deserve: freedom.

6.      On December 16, 2010, after being presented with evidence of Mr. Caldwell's innocence and the unreliability of the prosecution's witness's identification, Judge Charles

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

Haines granted Mr. Caldwell's petition for writ of habeas corpus, vacated his conviction and ordered the District Attorney to announce whether it would appeal, retry or dismiss the case against Mr. Caldwell.

7.     After further proceedings in the San Francisco Superior Court, all charges were dismissed against Mr. Caldwell on March 25, 2011. He was released from custody on March 28, 2011.

## III.

## PARTIES

8.     Plaintiff Maurice Antwone Caldwell is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged.

9.     At times relevant herein, Defendant Kitt Crenshaw ("CRENSHAW") was employed by and working on behalf of the San Francisco Police Department and resided within the jurisdiction of the State of California.  He was a San Francisco narcotics officer who actively participated in the homicide investigation resulting in the prosecution and wrongful conviction of Mr. Caldwell.

10.     At times relevant herein, Defendant Arthur Gerrans ("GERRANS") was employed by and working on behalf of the San Francisco Police Department and resided within the jurisdiction of the State of California.  He was a San Francisco homicide detective who actively participated in the investigation resulting in the prosecution and wrongful conviction of Mr. Caldwell.

11.     At times relevant herein, Defendant James Crowley ("CROWLEY") was employed by and working on behalf of the San Francisco Police Department and resided within the jurisdiction of the State of California.  He was a San Francisco homicide detective who actively participated in the investigation resulting in the prosecution and wrongful conviction of Mr. Caldwell.

12. Defendant City of San Francisco ("CITY") is, and at all times herein alleged was, a municipal corporation or political subdivision organized and existing under the laws of the State

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1   of California.  The San Francisco Police Department is, and at all times herein alleged was, an

2   agency of the City of San Francisco.

**IV.**

**GENERAL ALLEGATIONS**

13.   Plaintiff is informed and believes, and thereon alleges, that, at all times herein

mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each

of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the

scope of such agency, employment and/or conspiracy, and with the permission and consent of

other co-Defendants.

14.   Each paragraph of this complaint is expressly incorporated into each cause of

action which is a part of this complaint.

15.   The acts and omissions of all Defendants were engaged in maliciously, callously,

oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Mr. Caldwell.

**V.**

**FACTUAL ALLEGATIONS**

**I.  BACKGROUND**

16.   At the time of Mr. Acosta's murder, Mr. Caldwell was a 22-year-old African-

American man living in the City of San Francisco.  He had no adult convictions.

17.   Mr. Caldwell served much of his 20 plus years in custody in various maximum-

security prisons before his conviction was reversed.  He was released from custody of the

California Department of Corrections on March 28, 2010.  During those 20 long years, Mr.

Caldwell suffered the unimaginable horrors of life in maximum-security prisons.  He was

assaulted by other inmates.  He suffered back injuries and permanent damage due to the poor

working conditions in the jail's kitchen and inadequate health care.  He was unable to pursue a

profession or create a family.

18.   Throughout the 20 years in custody, Mr. Caldwell relentlessly worked to correct

this miscarriage of justice and procure his release, and always proclaimed his innocence.  In

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

pursuit of relief, he wrote countless letters asserting his innocence, the injustice of his conviction, and the problems in his case.  These included letters to various press organizations, lawyers, Innocence Projects, Centurion Ministries, and the San Francisco County Public Defender's Office.

19.     From the beginning of his case to his release, Mr. Caldwell adamantly refused to accept any plea bargain that would entail an explicit or implicit admission of guilt.  He refused to admit guilt while imprisoned even though refusing to do so effectively doomed his opportunity to be paroled.  After Mr. Caldwell's petition for a writ of habeas corpus was granted in December of 2010, the San Francisco County District Attorney's Office offered to dismiss all charges in exchange for his plea to manslaughter, attempted murder and shooting into an occupied vehicle, which, if accepted, would have secured his immediate release from custody and any parole term.  Mr. Caldwell rejected that offer.  Even after 20 years in custody, he risked a re-trial which could have resulted in a life sentence in prison, rather than admit to something that he did not do.

## II.  THE HOMICIDE

20.     On June 30, 1990, at approximately 2:40 am, Mr. Judy Acosta was shot and killed on Ellsworth Street in the Alemany Projects in San Francisco.

21.     Mr. Acosta had driven into the Projects with three friends, Domindaor Viray, Eric Aguirre, and Domingo Bobila, to purchase crack cocaine.

22.     A fight broke out between the purchasers and the sellers, and one of the sellers (whom we now know is Marritte Funches) pulled out a handgun and shot Mr. Acosta in the chest.

23.     Mr. Bobila, who had driven the car into the Projects, got back in the car and then pulled Mr. Acosta in the passenger side, pushing the car seat forward and placing Mr. Acosta in the back seat.

24.     As Mr. Bobila was attempting to start the car and drive away, someone (whom we now know is Henry Martin) pulled out a shotgun and began firing at the car.

25.   Mr. Bobila drove to a gas station where he asked the attendant to call an ambulance and attempted to administer CPR to Mr. Acosta.

26.   When the medical personnel arrived, they pronounced Mr. Acosta dead on arrival.

27.   The autopsy report lists the cause of death as a gunshot wound that penetrated Mr. Acosta's heart, lung and liver.  However, at trial, the medical examiner testified that shotgun pellets had contributed to the cause of death.

28.   Mr. Viray and Mr. Aguirre escaped on foot unharmed.

### III.   THE INVESTIGATION

29.   There was no forensic evidence -- fingerprints, DNA, hair samples, fibers, bloody footprints or handprints, etc. -- linking Mr. Caldwell to this murder.  There was no physical evidence -- no clothes, no blood, no money, and no murder weapon -- linking Mr. Caldwell to the offense.

30.   At no time during the investigation or trial did any of the three surviving victims ever positively identify Mr. Caldwell.

31.   Despite having no evidence connecting him to the crime, San Francisco Police Officers decided from the beginning to focus their investigation on Mr. Caldwell as their sole suspect.  A letter from the District Attorney's file states that "Officers familiar with the area suspected Mr. Caldwell might have been involved" although they had no evidence to support that suspicion.

32.   Defendants Arthur Gerrans and James Crowley, both homicide inspectors, were assigned to investigate the homicide of Judy Acosta.

33.   Defendant James Crowley authored a note dated July 12, nearly two weeks after the murder, claiming that an anonymous person had called Captain Philpott and advised police "to look into Maurice Caldwell."  The individual did not say that he had seen Mr. Caldwell participate in the crime or even heard that he was involved in the crime, but instead advised that Caldwell "had been shooting off guns in the projects for years."  Other than Inspector Crowley's note, there are no additional notes or reports from anyone, including Captain Philpott, about this

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

alleged call, nor is there any explanation of how an anonymous caller reached a Captain. The Inspectors' chrono does not mention an anonymous tip, but instead states that the chrono's author spoke to Captain Philpott "regarding description of suspects," and yet the alleged tip contains no descriptions and does not mention multiple suspects. It must also be noted that no one in the Projects knew Mr. Caldwell by the name Maurice Caldwell, as he went by his middle name of Antwone, and everyone knew him as "Twone" or "Little Twone."

34.   On July 13, 1990, Defendant Gerrans went to the Alemany Projects to canvas the neighborhood.

35.   Defendant Gerrans brought narcotics Sergeant Kitt Crenshaw, who was familiar with the area, with him to canvas the Projects.  Defendant Gerrans testified that he brought Defendant Crenshaw with him because Defendant Crenshaw knew "some of the residents" of the Projects, including Mr. Caldwell.

36.   Defendant Crenshaw worked at the Ingleside Station in San Francisco with Captain Philpott.

37.   Defendant Crenshaw had not been trained to conduct homicide investigations.

38.   At the time of the homicide investigation, the Office of Citizen Complaints was investigating Defendant Crenshaw for assaulting Mr. Caldwell.  On January 24, 1990, about six months prior to the murder, Defendant Crenshaw assaulted Mr. Caldwell, choked him and threatened to kill him while questioning him about a weapon that he did not have.  On January 26, 1990, Mr. Caldwell filed a citizen complaint against Defendant Crenshaw for conduct reflecting discredit on the department and unnecessary force.  That complaint was still pending at the time of the murder investigation.

39.   During the July 13 canvas, Defendant Gerrans found only one person willing to let him inside to talk about the shooting: Mary Cobbs.

40.   Mary Cobbs lived at 947 Ellsworth Street at the time.

41.   Ms. Cobbs knew Mr. Caldwell because he had lived next door to her at 949 Ellsworth Street.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

42.   While Defendant Gerrans was in Ms. Cobbs home, Defendant Crenshaw grabbed Mr. Caldwell, pushed him up against a wall, handcuffed him, and dragged him up to Mary Cobbs' front door.

43.   Ms. Cobbs answered the door, and Defendant Crenshaw asked to speak to the homicide inspector.  Defendant Crenshaw told Defendant Gerrans something to the effect of, "This is Maurice Caldwell, Twone, the guy I've been telling you about.  I need the keys to put him in the patrol car."  All of this was within Ms. Cobbs' hearing and could be heard on the tape of her interview.

44.   After Defendant Crenshaw displayed Mr. Caldwell to Ms. Cobbs, identified Mr. Caldwell by name and nickname, and implied that he was arresting Mr. Caldwell, Defendant Gerrans ensured Ms. Cobbs understood that Defendant Crenshaw was arresting Mr. Caldwell in relation to this case by telling her that the officer at the door was working with him.

45.   Defendant Crenshaw placed Mr. Caldwell in the police car and asked him about the crime.  Mr. Caldwell told Defendant Crenshaw the truth – that he was not involved.  Defendant Crenshaw however, fabricated a police report alleging that Mr. Caldwell had said "that he was present at the shooting, but was down the street.  Prior to the shooting Caldwell was with the suspects dealing drugs [but walked away prior].[1]  After the shooting, Caldwell returned and started yelling at the shooters.  He did this because he felt he was going to be blamed."

46.   Defendant Crenshaw had no warrant, no evidence, and did not arrest Mr. Caldwell that day, but rather, after displaying him to Ms. Cobbs in this suggestive manner, removed the handcuffs and released Mr. Caldwell.

47.   Meanwhile, Defendant Gerrans continued to interview Ms. Cobbs.  Ms. Cobbs did not in any way indicate that the man at the door was the shooter.

48.   Ms. Cobbs did not tell Defendant Gerrans that the man who lived or had lived next door to her was a participant.

---

[1] The bracketed words were crossed out in the handwritten police report.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

49.   Instead, Ms. Cobbs told Defendant Gerrans that the shooters were not from the area and that she had heard they were from Sunnydale or Hunter's Point.  She also told Defendant Gerrans that she did not know the shooters' names or nicknames.

50.   Defendants Gerrans, Crenshaw and Crowley knew or should have known that Mr. Caldwell was from the Alemany Projects and had lived in the apartment right next to Ms. Cobbs' apartment.

51.   Despite the fact that Ms. Cobbs had not identified Mr. Caldwell when a uniformed officer brought him to her front door and instead said that the shooters were not from the area and she did not know their names or nicknames, Defendants Gerrans, Crowley and Crenshaw continued to focus their investigation on Mr. Caldwell.

52.   On July 17, the same day that Defendants Gerrans and Crowley met with Defendant Crenshaw regarding this case, Defendants Gerrans and Crowley went to Mr. Caldwell's grandmother's house (the address listed on his identification card) and left a message with her to tell Mr. Caldwell to call them.

53.   The following day, Mr. Caldwell called Defendants Gerrans and Crowley, and agreed to meet them at his grandmother's house.  Mr. Caldwell kept that appointment and agreed to go down to the station with Defendants Gerrans and Crowley. He reiterated to Defendants Gerrans and Crowley what he had told Defendant Crenshaw – that he was not involved in this murder.

54.   Mr. Caldwell asked Defendants Gerrans and Crowley why they kept questioning him about the murder and they told him that they had heard from Defendant Crenshaw that he was present during the shooting and with the shooters before and after.  Mr. Caldwell told them he had never made any such statement and that it was not true.  He further explained that Defendant Crenshaw was always "fucking with me" and that he had filed a complaint against Defendant Crenshaw.

55.   Defendants Gerrans and Crowley asked Mr. Caldwell if he would take a polygraph test regarding his alleged statement to Defendant Crenshaw, which he agreed to.  Then Mr.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

Caldwell asked if they would polygraph Defendant Crenshaw about the alleged statement as well.  Defendants Gerrans and Crowley said they would not and released Mr. Caldwell, who took a bus home.  A few days later, Mr. Caldwell called and told Defendants Gerrans and Crowley that he would not take a polygraph test unless they also polygraphed Defendant Crenshaw.

56.   Throughout the entirety of this case, Defendants Gerrans, Crowley and Crenshaw did not question anyone other than Maurice Caldwell as a suspect.

57.   On July 26, 1990, two weeks after the show-up at which Defendant Crenshaw had presented Mr. Caldwell to Ms. Cobbs in person, and four weeks after the murder, Defendants Gerrans and Crowley presented Ms. Cobbs with a six-pack that included Mr. Caldwell's photograph.

58.   Defendants Gerrans and Crowley still had no evidence linking Mr. Caldwell to this crime.  In fact, based on Ms. Cobbs' first statement, Defendants Gerrans, Crowley and Crenshaw knew or should have known that Mr. Caldwell was innocent.

59.   Defendants Gerrans and Crowley did not record or in any way memorialize what was said during the initial identification procedure, but instead turned on the tape recorder only after they had obtained an identification of Mr. Caldwell from Ms. Cobbs.

60.   When the tape was on, Ms. Cobbs stated that she knew Mr. Caldwell by his nickname "Twone". Defendants Gerrans and Crowley did not ask her why she had not provided that information during the earlier interview, nor did they ask why she had initially told Defendant Gerrans that she did not know the shooters' names or nicknames.  Ms. Cobbs even explained to Defendants Gerrans and Crowley that she knew Mr. Caldwell as "Little Twone" to be distinguished from another man in the neighborhood who was known as "Big Twone" a.k.a. Charles Waddell.  Still, neither Defendant Gerrans, nor Defendant Crowley asked Ms. Cobbs why she had not provided this information in the first interview or why she had provided contradictory information in that first interview.

61.   Defendants Gerrans and Crowley further did not ask Ms. Cobbs why she had not told Defendant Gerrans that the shooter had lived or stayed next door to her.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

62.   Rather than ask questions to verify the validity of her identification, Defendants Gerrans and Crowley improperly confirmed Ms. Cobbs' identification and offered her incentives to continue to identify Mr. Caldwell.

63.   Defendant Gerrans told Ms. Cobbs that she had identified "the man with the shotgun, Maurice Caldwell," and reiterated that she had selected "the suspect, Maurice Caldwell."

64.   Defendant Crowley told Ms. Cobbs that Defendants Gerrans and Crowley would move her out of the Alemany Projects, where she had feared for her safety even before this shooting, if she continued to cooperate and agreed to be their witness.

65.   Mr. Caldwell cooperated fully with the investigation into the Acosta murder and remained in the area, even after Defendants repeatedly questioned him about his involvement in this murder.  Defendant Crenshaw questioned Mr. Caldwell on July 12 and then released him. When he heard that police were looking for him, Mr. Caldwell called Defendants Gerrans and Crowley, made an appointment to meet them, and kept that appointment.  He remained in the San Francisco area, staying in the Alemany Projects, right next door to Mary Cobbs, until he was arrested on September 21, 1990.

66.   After his arrest on September 21, 1990, Mr. Caldwell agreed to speak to Defendants Gerrans and Crowley for a third time in regards to this homicide, again denying any involvement with the homicide.

67.   For over twenty-one years, Mr. Caldwell has consistently maintained that he was not outside when the homicide occurred, that he had nothing to do with the commission of the crime or any prior planning that might have occurred, that he did not fire a weapon during the crime, and that he only went outside afterwards to see what happened.

68.   At no point leading up to or even after his arrest did police ever obtain any evidence linking Mr. Caldwell to this murder other than the Defendant Crenshaw's fabricated report and Mary Cobbs' unreliable identification which Defendants Gerrans, Crowley, and Crenshaw obtained by using impermissibly suggestive procedures.

11

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

## IV.   POST ARREST - THE TUNNEL VISION CONTINUES

69.     After Mr. Caldwell's arrest, Defendants Gerrans and Crowley continued their attempts to build a case against him.  They conducted a live lineup at which none of the surviving victims positively identified Mr. Caldwell.

70.   On October 17, 1990, Mr. Caldwell's trial attorney told Defendants Gerrans and Crowley of the identities of the true perpetrators: specifically that Marritte Funches fired the handgun, Henry Martin fired the shotgun, and Eric Brown punched Bobila.  Defendants Gerrans and Crowley placed the three men in six-packs and showed them to the surviving victims and Mary Cobbs in the ensuing weeks, approximately six months after the murder, at which time no one could identify them.  Defendants Gerrans and Crowley did nothing further to investigate these men.  They never attempted to speak to them, and did not interview them repeatedly as they had Mr. Caldwell.

71.   Defendants Gerrans and Crowley interviewed more witnesses, but only discovered more evidence of Mr. Caldwell's innocence.  They interviewed Alice Carruthers, who said that she was out on the street at the time of the shooting and saw Marritte Funches pull out a handgun and shoot the victim, at which point she turned and ran home.  Ms. Carruthers told Defendants Gerrans and Crowley that Mr. Caldwell was not on the street at the time.

72.   Defendants Gerrans and Crowley also interviewed multiple witnesses who informed them that Mr. Caldwell was inside Deborah Rodriguez's apartment, upstairs with a female named Tina at the time the shots were fired.  Those witnesses include Deborah Rodriguez, James Green, Jacqueline Williams (whom the prosecution called as a rebuttal witness and who maintained that Mr. Caldwell was inside when the shots were fired) and Mr. Caldwell himself.

73.   Defendants Gerrans and Crowley never attempted to interview Marritte Funches, and even a cursory investigation would have revealed that Mr. Funches had a prior conviction for assault with a firearm, and fled the state within months of the murder.  Further, on March 27, 1991, nine days after Mr. Caldwell's conviction and one month prior to his sentencing, Mr. Funches shot and killed a taxi driver in Reno, Nevada.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

## V.  SUPERIOR COURT PROCEEDINGS

74.   At the preliminary hearing and at trial, the only witness to identify Mr. Caldwell as a perpetrator was Mary Cobbs.  No other witness or evidence ever connected Mr. Caldwell to the crime.

75.    Mary Cobbs' identification, obtained through impermissibly suggestive identification procedures, was completely unreliable and should not have been admitted at trial. Ms. Cobbs testified that she woke in the middle of the night to the gunshots, went to her bedroom window which was covered with a grate, looked out a little whole in the grate at a strained angle and saw two people standing 70 feet away.  Her testimony as to what she saw and heard was both internally inconsistent and inconsistent with the physical evidence, undisputed facts, and testimony from the surviving victims.

76.   Betty Jean Tyler testified that Mr. Caldwell lived with her from around January of 1988 until he was arrested for the murder around the end of August of 1990, and that they lived next door to a lady named Mary.

77. Alice Caruthers testified that she was out on the street and saw Marritte arguing with a Filipino man and another customer Ms. Caruthers had seen in the courthouse. All of a sudden, Marritte pulled out a handgun and fired at the man. Ms. Carruthers turned and ran home, while Marritte continued to fire his gun. Mr. Caldwell was not on the street at the time.

78. Deborah Rodriguez testified that Mr. Caldwell was inside her apartment when the shots were fired, upstairs with a female named Tina, and that he ran downstairs after the shots ceased. Mr. Rodriguez and Mr. Caldwell went outside to see what happened, and no further shots were fired.

79. The prosecution called Jacqueline Williams as a rebuttal witness, who also testified that Mr. Caldwell was in Ms. Rodriguez's apartment, upstairs, when the shots were fired, and ran down and outside after. Her testimony differed from Ms. Rodriguez's only in that she testified that Mr. Caldwell went outside first and and Ms. Rodriguez followed later. However, both maintained that no shots were fired while Mr. Caldwell was outside.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

80. Based on the false eyewitness testimony of Mary Cobbs, tainted by the actions of Defendants Gerrans, Crowley, and Crenshaw, Mr. Caldwell was wrongfully tried and convicted.

## VI.   POST-CONVICTION DISCOVERIES.

81.   Marritte Funches, when finally interviewed about the murder of Judy Acosta, confessed to the crime in great detail – in letters, under oath in declarations, in person to multiple different attorneys, and has reiterated his willingness to testify in court time and time again.  He has also drawn detailed diagrams of the scene that comport with the physical evidence and testimony from the surviving victims.  He has sworn repeatedly that Mr. Caldwell was not present or involved.

82.  In addition to the indicia of reliability surrounding Mr. Funches' many confessions over the past five years, his confession is corroborated by the fact that he was named as the actual perpetrator to police and at trial.

83.  Mr. Funches' confessions are further corroborated by the two witnesses discovered post-conviction who saw the entire crime and identified Mr. Funches as the man who fired the handgun.

84.  In his confessions, Mr. Funches also explained that if Ms. Cobbs had truly looked out her window during the shooting, she would have seen him standing directly in front of her window in the street.  He swears that he knew Ms. Cobbs and she would have recognized him. In fact, when Ms. Cobbs viewed the six-pack with Mr. Funches' photograph, she told Defendants Gerrans and Crowley that she knew Mr. Funches as someone who was out in the street all the time, but she was not sure if he was outside the night of the shooting, another indication that she did not actually see the shooters well enough to recognize or identify them.

85.  Further, Mr. Funches has sworn that he never stood under the streetlight, while Mary Cobbs testified she saw both shooters standing under the light pole.  Finally, Mr. Funches has sworn that the man with the shotgun, who was not Maurice Caldwell, was standing on the side of Ms. Cobbs' building and not under the light pole.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

86. Although Ms. Cobbs testified repeatedly that when she looked out her bedroom window she saw two men standing under the light pole with guns, post-conviction investigation revealed that she cannot even see that light pole from her bedroom window.

87. Marcus Mendez was in his mother's house when he heard the gunshots. He provided a declaration stating that after the shots stopped, he looked out his kitchen door and saw a group of people gathered on Ellis Street. He then saw Maurice Caldwell running towards the gathering empty handed. He did not hear any further shots after seeing Mr. Caldwell running towards the shooting. When contacted by the District Attorney's Office, he maintained the truth of his declaration.

88. Maurice Tolliver was out on the street at the time of the shooting and saw the entire crime. He has sworn under oath, and told Mr. Caldwell's habeas counsel in 2009, along with Assistant District Attorney Susan Christian and DA investigator Al Salerno in 2010, that Mr. Caldwell was not present during the shooting or involved in anyway. He has described the events in detail consistent with the physical evidence and testimony from the victims. He has sworn that a light-skinned man named Marritte fired a handgun, shooting one of the victims in the chest area from a few feet away. Then Henry Martin (described as an older man with a dark-complexion who was a dope fiend) fired a larger gun. Mr. Tolliver's description of the scene and diagrams place the shooters' in the exact same locations as Marritte Funches' own confession and diagram does. Again, this contradicts Mary Cobbs' testimony and undermines what little credibility her statements had.

89. While the habeas petition was pending in 2009 and 2010, Mr. Funches disclosed who else was present during the shooting – "Lil Mo" (Maurice Tolliver) and a man named Demetrius. Mr. Caldwell's habeas counsel noted a Demetrius Williams in the police reports and located him through his mother Emma Williams. Demetrius (whose legal last name is Jones) was on the street at the time of the shooting and described what he saw first to Mr. Caldwell's habeas counsel and then to Assistant District Attorney Susan Christian and DA investigator Al Salerno. He disclosed that Marritte Funches fired the handgun, and that Henry Martin was the

shotgun shooter.  He described details of the crime consistent with the surviving victims' testimony, along with statements from Funches and Tolliver.  Specifically, Demetrius placed the shooters in the exact same locations in which Funches and Tolliver placed them.  Demetrius had never spoken to Funches, Tolliver or Caldwell about what happened that night and Mr. Caldwell was not even aware that Demetrius was a witness until after Mr. Funches disclosed that fact and Mr. Caldwell's habeas counsel located and interviewed Demetrius.

90.   Henry Martin has stated that he would talk about the incident if provided immunity.

91.   Tina McCullum told the San Francisco Public Defender who represented Mr. Caldwell in the re-trial proceedings that she still recalls spending the night of her birthday with Mr. Caldwell, upstairs in an apartment in the Alemany Projects.  They were in bed when the shots were fired.  Mr. Caldwell got up, got dressed, and went to see what happened.  Ms. McCullum stayed in the room, and Mr. Caldwell returned a few moments later.  She did not hear any more shots while he was gone, and he did not smell like gunpowder or fireworks when he returned. Ms. McCullum has sworn to these facts under penalty of perjury.

92.   When contacted and interviewed for the re-trial, Alice Caruthers and Deborah Rodriguez maintain their trial testimony and statements to police.

93.   Ms. Caruthers recalls seeing Marritte Funches pull out a handgun and shoot the victim, at which point she turned and ran home.[2]

94.   Ms. Rodriguez recalls that Mr. Caldwell was upstairs with a girl named Tina when the shots were fired, and that he ran downstairs and outside after the shots ceased to see what happened.

95.   Even though they had received the names of the actual participants in the shooting, at no point during their investigation did Defendants Gerrans, Crowley and Crenshaw interview anyone other than Mr. Caldwell as a suspect in relation to this murder.  In fact, no law

---

[2] Mr. Caldwell's habeas counsel was unable to locate Jacqueline Williams, who told police and testified at trial *for the prosecution* that Mr. Caldwell was inside when the shots were fired, ran downstairs and outside after the shots stopped, and she did not hear any more shots while Mr. Caldwell was outside.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1    enforcement has ever interviewed anyone other than Maurice Caldwell as a suspect in Mr.

2    Acosta's murder as of the day of this filing, even after two witnesses identified the two shooters

3    as Marritte Funches and Henry Martin, and Mr. Funches confessed to the murder under oath.

**VII.     AS THE RESULT OF THE CITY OF SAN FRANCISCO'S POLICIES, CUSTOMS AND PRACTICES VIOLATING THE RIGHT TO BE FREE FROM IMPROPER AND SUGGESTIVE EYEWITNESS IDENTIFICATIONS, SUGGESTIVE EYEWITNESS IDENTIFICATION PROCEDURES WERE ROUTINELY EMPLOYED WITH EYEWITNESSES.**

8          96.  The San Francisco Police Department had no established or clear policy regarding

9    the following issues pertaining to eyewitness identification: a) ensuring that eyewitness

10   identification procedures complied with the requirements of due process, including those set out

11   in *Manson v. Braithwaite* and *Neil v. Biggers*; b) ensuring that police personnel, whether through

12   inadvertence or design, did not provide information to potential eyewitnesses that influenced the

13   identification; c) fully and completely documenting police personnel's interactions with

14   eyewitnesses; d) training police personnel regarding the constitutionality of identification

15   procedures and their obligations to provide prosecutor(s) eyewitness identification information

16   that is exculpatory in the case in which the eyewitness was making an identification; and e)

17   supervising police personnel in the provision of eyewitness identification information that is

18   exculpatory to the prosecutor(s) in the case in which the eyewitness was making an

19   identification.

20         97.  To the extent that the San Francisco Police Department had policies regarding the

21   issues set out in the foregoing paragraph, the policies were not implemented by police personnel

22   in cases in which an eyewitness was used.  Not only were any such titular policies not

23   implemented or followed, but the San Francisco Police Department had a custom and practice of:

24   a) failing to ensure that eyewitness identification procedures complied with the requirements of

25   due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*; b) failing to

26   ensure that police personnel, whether through inadvertence or design, did not provide

27   information to potential eyewitnesses that influenced the identification; c) failing to ensure that

28   police personnel fully and completely documented their interactions with eyewitnesses; d) failing

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

to properly or adequately train police personnel regarding the constitutionality of identification procedures and in the provision of eyewitness identification information that is exculpatory to the prosecutor(s) in the case in which the eyewitness was making an identification; and e) failing to properly or adequately supervise police personnel in the provision of eyewitness identification information that is exculpatory to the prosecutor(s) in the case in which the eyewitness was making an identification.

98.   The actions and inactions of the San Francisco Police Department set forth in the preceding two paragraphs were known or should have been known to the policy makers responsible for the San Francisco Police Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

99.   The actions and omissions of the San Francisco Police Department set forth in the preceding three paragraphs were a motivating force behind the violations of Mr. Caldwell's constitutional rights as set forth in this complaint.  As a result of those violations, Mr. Caldwell was wrongfully convicted and imprisoned for 20 years.

## VIII.          FAILURE TO MAINTAIN AN ADEQUATE DISCIPLINE SYSTEM

100.   The City of San Francisco and the San Francisco Police Department maintained a system of responding to citizen complaints through the Office of Citizen Complaints (the "OCC") that was so broken and ineffective that police officers rarely were disciplined for improper conduct.  For example, although in excess of 60 OCC complaints were filed against defendant Crenshaw between 1991 and 2009, only one resulted in a sustained claim (for the complaint made by plaintiff here six months prior to the murder investigation), and as to that claim, the chief of police declined to impose any discipline.

101.   The City of San Francisco and the San Francisco Police Department had a custom and practice of failing to adequately investigate and act upon complaints about officer conduct, including but not limited to complaints alleging retaliation, intimidation and fabrication of

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1   evidence, and failing to monitor and discipline officers for their unlawful conduct, thereby

2   encouraging officers to engage in such conduct with impunity, and final policy makers ratified

3   this misconduct.  The recent public announcement by the San Francisco District Attorney's

4   Office that it is convening an investigation into the SFPD's culture and practice, reaching back

5   for decades, of tolerating unlawful conduct by its officers, resulting in scores of unlawful arrests

6   and wrongful convictions, particularly among racial minorities, underscores that the conduct

7   engaged in by the defendant officers here was a direct result of the culture endemic to the SFPD

8   during the relevant time period.  This culture, as evidenced by the SFPD's demonstrated failure

9   to curb or discipline unlawful conduct such as that repeatedly displayed by defendant Crenshaw

10  during his tenure as a SFPD officer, including as it directly impacted plaintiff, amounted to a

11  ratification by the SFPD of such conduct by defendant Crenshaw and other officers of the SFPD.

12      102.  The actions and omissions of the City of San Francisco and the San Francisco

13  Police Department set forth in the preceding three paragraphs were a motivating force behind the

14  violations of Mr. Caldwell's constitutional rights as set forth in this complaint.  As a result of

15  those violations, Mr. Caldwell was wrongfully convicted and imprisoned for 20 years.

16  **IX.      MR. CALDWELL'S PETITION FOR WRIT OF HABEAS CORPUS**

17      103.  On December 16, 2010, the San Francisco County Superior Court granted Mr.

18  Caldwell's petition for writ of habeas corpus finding that Mr. Caldwell's counsel was ineffective

19  for failing to investigate the evidence of Mr. Caldwell's innocence and that as a result, Mr.

20  Caldwell had not received a fair trial.  Consequently, the judge concluded that no other issues

21  relating to Mr. Caldwell's wrongful conviction needed to be looked at or determined by his

22  Court, including Mr. Caldwell's claims of false testimony and actual innocence.  As a result,

23  none of the claims being raised in this complaint have been considered or determined by any

24  Court prior to the date of filing this complaint.

25      104.  Ultimately Mr. Caldwell was not re-tried and the charges against him were

26  dismissed.  Accordingly, he is an innocent man as a matter of law.

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

105.   When Mr. Caldwell was released from the custody of Defendant County of San Francisco on March 28, 2010, he had been wrongfully and continuously held in custody since September 21, 1990, over 20 years.

## PARTICIPATION, STATE OF MIND AND DAMAGES

106.  All Defendants acted without authorization of law.

107.  Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them.  Each defendant ratified, approved or acquiesced in the violations alleged herein.

108.  As joint actors with joint obligations, each defendant was and is responsible for the failures and omissions of the other.

109.  Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

110.  Each Defendant acted with a deliberate indifference to or, reckless disregard for, Mr. Caldwell's innocence, an accused's rights to be free from fraud and fabrication of evidence, and /or for the Plaintiff's right to an eyewitness identification free from improper suggestion, and/or for the Plaintiff's right to a fair trial and due process of law.

111.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

112.  Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, Plaintiff will incur significant damages based on psychological and medical care.

113.  As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

114.  As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to get married and raise a family.

115.  The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each defendant other than defendant City of San Francisco in an amount to be proven at the trial of this matter.

116.  By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## FIRST CLAIM FOR RELIEF

### DUE PROCESS – 42 U.S.C. §1983

### Subclaims:

**I.**     *Manson/Biggers* **violations;**

**II.**    **Fabrication of Evidence/***Deveraux* **Claim**

### (Against All Defendants)

117.  Plaintiff realleges paragraphs 1 through 116, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

118.  As described above and below, Defendants Gerrans, Crowley, and Crenshaw, and DOES 1-10, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights to a due process and a fair trial.

119.  As described above, Defendants Gerrans, Crowley, and Crenshaw deliberately tainted the investigation through their impermissibly suggestive identification procedures, fabrication of evidence, and manipulation of witnesses, thereby misleading and misdirecting the

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1   criminal investigation into Mr. Caldwell.  Absent this misconduct, the prosecution of Mr.

2   Caldwell could not and would not have been pursued.  Moreover, as a result of the suggestive

3   identification procedure, the admission of Ms. Cobbs' unreliable identification, and Defendants'

4   fabrication of evidence, Mr. Caldwell's constitutional rights to due process and to a fair trial

5   were violated. Mr. Caldwell spent over 20 years incarcerated for a crime he did not commit as a

6   result of these constitutional violations.

7      120.  Defendants Crenshaw, Gerrans, and Crowley's misconduct directly resulted in Mr.

8   Caldwell's wrongful conviction in violation of the Due Process Clause of the Fourteen

9   Amendment to the United States Constitution.

10     121.  The misconduct was objectively unreasonable and was undertaken intentionally and

11  with willful indifference to Mr. Caldwell's constitutional rights.

12  **I.**     ***MANSON/BIGGERS* VIOLATIONS**

13     122.  Defendants Crenshaw, Gerrans, and Crowley, while acting under color of law,

14  deprived Plaintiff of his civil rights by using an impermissibly and unnecessarily suggestive

15  identification procedure to secure an unreliable identification of Mr. Caldwell in violation of the

16  due process cause as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*,

17  409 U.S. 188 (1972).  The actions of each Defendant in violating Plaintiff's right to have an

18  eyewitness identification by Mary Cobbs that was reliable and free from undue suggestion or

19  influence were done with deliberate indifference to or reckless disregard for Plaintiff's rights or

20  for the truth.

21     123.  "It is clearly established that a suggestive procedure intended to produce a false

22  identification would violate [Plaintiff's] constitutional rights."  *Brewster v. Shasta County*, 27

23  Fed. Appx. 908, 912-913 (9th Cir. 2001).

24     124.  The constitutional source of the obligation to conduct eyewitness identifications

25  free from improper suggestion or influence is the due process clause of the Fifth and Fourteenth

26  Amendments.  Mr. Caldwell's due process rights were violated by the conduct alleged herein.

27  Mr. Caldwell brings this claim as a procedural, or alternatively as a substantive, due process

28

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1    violation.  To the extent that any Court were to conclude that the source of Mr. Caldwell's right

2    to eyewitness identifications free from improper suggestion or influence is any constitutional

3    source other than due process, this claim is brought on those bases as well.

4         125.  The United States Supreme Court has explained that certain "identification

5    procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken

6    identification' as to be a denial of due process of law."  *Foster v. California*, 394 U.S. 440, 442

7    (1969), quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1969).  "[I]n some cases the procedures

8    leading to an eyewitness identification may be so defective as to make the identification

9    constitutionally inadmissible as a matter of law."  *Id*. at p. 442, fn 2.  This is because the

10   "procedure so undermined the reliability of the eyewitness identification as to violate due

11   process."  *Id*.

12        126.  The Supreme Court reversed Foster's conviction, finding the identifications

13   unreliable and inadmissible under the due process clause where the witness failed to identify

14   Foster from a suggestive lineup, then tentatively identified him from a show up and finally

15   positively identified Foster at a subsequent lineup.  The court said that an identification of Foster

16   following such a suggestive procedure was "all but inevitable."  *Id*. at p. 443.

17        127.  Similarly, here, Ms. Cobbs' identification of Mr. Caldwell was the unreliable

18   product of an impermissibly suggestive identification procedure and was all but inevitable

19   following the suggestive procedure.

20        128.  Defendant Crenshaw brought Mr. Caldwell to Ms. Cobbs' front door while

21   Defendant Gerrans was interviewing her about the murder, identified Mr. Caldwell by name and

22   nickname, said Mr. Caldwell was the person he had been telling Defendant Gerrans about, and

23   indicated that he was arresting Mr. Caldwell by requesting keys in order to put him in the police

24   car.  Defendant Gerrans ensured Ms. Cobbs understood that Defendant Crenshaw was arresting

25   Mr. Caldwell in relation to this homicide by telling her that the officer at the door was working

26   with him.

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

129.  When Ms. Cobbs still did not identify Mr. Caldwell – by stating that the man at the door was the shooter or by saying that she knew the man with the shotgun because he stayed next door to her and went by the nickname "Twone" – Defendants Gerrans and Crowley returned to Ms. Cobbs and presented her with a photographic lineup or "six-pack" that included Mr. Caldwell's photograph.

130.  "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police." *United States v. Wade,* 388 U.S. 218, 234 (1967).

131.  Not only did Defendants present Mr. Caldwell to Ms. Cobbs repeatedly before she identified him, but they also ignored her initial statements which indicated that Mr. Caldwell was not the shooter (i.e., that the shooters were not from the area and she did not know their names or nicknames).

132.  When Ms. Cobbs told Defendants Gerrans and Crowley that she recognized Mr. Caldwell as "Twone" and even clarified that she knew him as "Little Twone" to be distinguished from another man who went by "Big Twone," Defendants Gerrans and Crowley failed to ask Ms. Cobbs why she had not informed Defendant Gerrans during the first interview that one of the shooters went by the nickname "Twone" and instead told Defendant Gerrans that she did not know the shooter's nicknames.

133.  Defendants Gerrans and Crowley failed to record the initial identification procedure, only turning on the tape recorder after Ms. Cobbs had understood that she was supposed to identify Mr. Caldwell and selected his photograph from the lineup.  In fact, there are no notes or other documentation about the initial portion of the identification procedure.

134.  Defendant Crowley further exerted improper influence over the identification by offering Ms. Cobbs an incentive to continue to identify Mr. Caldwell.

135.  Defendant Gerrans improperly confirmed to Ms. Cobbs that she had selected the "right" person by telling her that she had identified "the man with the shotgun, Maurice

24

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

Caldwell" and also that she had identified "the suspect, Maurice Caldwell," thereby tainting all subsequent identifications as well.

136.  In addition to the impermissibly suggestive identification procedure Defendants used, the totality of the circumstances demonstrates that Ms. Cobbs' identification of Mr. Caldwell was completely unreliable and thus its admission violated Mr. Caldwell's rights to due process and a fair trial.

137.  The Supreme Court explained in *Neils v. Biggers* that a defendant's right to due process is violated by the admission of an identification obtained from an unnecessarily suggestive procedure that is also unreliable under the totality of circumstances including:  1) the witness' opportunity to view the perpetrator; 2) the degree of the witness' attention; 3) the accuracy of the witness' past description of the perpetrator; 4) the level of certainty of the identification; and 5) the time between the incident and the confrontation.

138.  These factors are difficult to apply here, where Ms. Cobbs eventually identified her next-door neighbor, someone who, by her own testimony, she knew because he had lived next door to her, and whom she knew by his nickname "Twone."  Yet when first interviewed by police, Ms. Cobbs told police that she did not know the shooters names or nicknames, and that the shooters did not live in the area, but rather were from Sunnydale or Hunter's Point.

139.  Only after Defendants presented Mr. Caldwell to Ms. Cobbs as their suspect twice did Ms. Cobbs completely change her statement and claim that "Twone," whom she knew because he lived next door, was the shotgun shooter.  Thus under the totality of the circumstances, this identification was completely unreliable.  In addition, the factors identified in *Neils v. Biggers*[3] further demonstrate the unreliability of Ms. Cobbs' identification.

---

[3] While application of these factors may demonstrate the unreliability of identifications, their use to establish the reliability of identifications has been found so inadequate that the high courts of numerous jurisdictions have rejected their application and begun crafting new standards.  See *State v. Henderson*, 208 N.J. 208, 285-286 (2011)[New Jersey's Supreme Court ordered a full evidentiary hearing on *Manson* test and found that "it does not adequately meet its state goals: it does not provide a sufficient measure for reliability, it does not deter, and it overstates the jury's innate ability to evaluate eyewitness testimony." Further, three of the facts (opportunity to view,

25

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

140.  Ms. Cobbs had a poor opportunity to view the perpetrators.  She was woken from sleep during the night by the sound of gunfire, walked to her bedroom window and looked at people standing 70 feet way, through a window with a grate on it, at night, and at a strained angle.  Further, Ms. Cobbs claimed at trial that she saw two men standing under the light pole, but one cannot actually see the light pole from her bedroom window.

141.  Ms. Cobbs did not testify to her degree of attention, but her inability to recall details consistently, as well as the discrepancies between what she claimed to have seen and the undisputed facts, demonstrate her lack of attention.  For instance, Ms. Cobbs testified at different points to hearing three, four, and six shots while lying in bed, and to seeing two, three, four, and five shots while standing at the window.  Ms. Cobbs also claimed to have seen Mr. Caldwell standing six feet behind the car shooting at it with a shotgun, and yet the back of the car sustained no damage.  Further, she testified that she saw a man lying in the passenger seat of the

degree of attention and level of certainty) rely on self-reporting and "research has shown that those reports can be skewed by the suggestive procedures themselves and thus may not be reliable." The Court further explained how this test may unintentionally reward suggestive police practices because, "the more suggestive the procedure, the greater the chance eyewitnesses will seem confident and report better viewing conditions."] See also *State v. Lawson*, 352 Or. 724, 748 (2012) [discussing the *Classen* test modeled after the federal *Manson/Biggers* test and finding it inadequate, explaining that, "the current scientific knowledge and understanding regarding the effects of suggestive identification procedures indicates that self-reported evidence of the *Classen* factors cand be inflated by the suggestive procedures itself. That fact creates in turn a sort of feedback look in which self-reports of reliability, which can be exaggerated by suggestiveness, are then used to prove that suggestiveness did not adversely affect the reliability of an identification. The result is contrary to the scientific research establishing that suggestiveness *adversely* affects reliability."]; *State v. Ramirez* (1991) 817 P.2d 774 (1991) [Utah's Supreme Court has noted that "several of the criteria listed by the Court [in *Neil v. Biggers*] are based on assumptions flatly contradicted by well-respected and essentially unchallenged empirical studies" and instead requires an "in-depth appraisal of the identification's reliability" considering, among other factors, whether the identification was spontaneous or was the product of suggestion]; *People v. Adams* 53 N.Y.2d 241, 251-252 (1981) [pre-trial identifications are inadmissible if the procedure used was unnecessarily suggestive because courts and juries are not good at judging reliability following a suggestive procedure]; *State v. Dubose* (2005) 285 Wis.2d 143 [Finding the *Neil v. Biggers* factors inadequate to judge reliability and safeguard against wrongful convictions, and changing the law so that evidence obtained as a result of an out-of-court show-up is inadmissible unless the procedure was necessary under the totality of circumstances.].)

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

car, but Mr. Acosta was in fact lying in the back seat of the car and the passenger seat was empty.  She also claimed to have seen shots fired and ensuing damage that was simply not physically possible.

142.  Ms. Cobbs' initial description of the perpetrators in no way matches her eventual identification of Mr. Caldwell.  She initially stated that the shooters did not live in the area, and she did not know their names or nicknames.  Yet she later identified Mr. Caldwell as the shotgun shooter and testified that she knew him because he had lived next door to her.  She also testified that she knew Mr. Caldwell by his nickname "Twone" when he lived next door to her even prior to the shooting.

143.  Ms. Cobbs did eventually exhibit certainty in her unreliable identification of Mr. Caldwell, but that was only after police suggested to her that he was the shooter, and then confirmed her selection of Mr. Caldwell and offered her incentives to continue to identify him.  It is unknown what level of certainty Ms. Cobbs exhibited when first identifying Mr. Caldwell because the inspectors did not turn on the tape recording until after they had obtained an unreliable identification of him via their suggestive procedures.  After turning on the tape, the inspectors informed Ms. Cobbs that she had "picked the man with the shotgun, Maurice Caldwell," and also told her that she had chosen, "the suspect, Maurice Caldwell," thereby tainting both Ms. Cobbs' initial identification and all further identifications, especially where she knew him and could easily identify him again.

144.  Although Ms. Cobbs knew Mr. Caldwell as "Little Twan," had seen him at her door in the company of an officer, knew that he had lived next door to her and continued to stay there, and had spoken to Defendant Gerrans about the shooters, Ms. Cobbs did not identify Mr. Caldwell until after Defendants suggested repeatedly that he was the shooter and an entire month had passed.

145.  Defendants Crenshaw, Gerrans, and Crowley were each jointly and severally responsible to ensure that any identification procedure was free from suggestion or influence by

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

police, and violated that responsibility.  Each engaged in, knew or should have known of the unconstitutional conduct alleged herein, and ratified, approved or acquiesced in it.

146.  As a result of Defendants' violations of Mr. Caldwell's constitutional rights as alleged above, Mr. Caldwell was wrongfully convicted and imprisoned for over 20 years.

## II.    FABRICATION OF EVIDENCE/*DEVEREAUX* CLAIM

147.  There is a clearly established due process right not to be subjected to criminal charges on the basis of deliberately fabricated false evidence by the Government.  *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (*en banc*).  As the court explained in *Deveraux*, a plaintiff asserting a fabrication of evidence claim must plead facts showing that: "(1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."  *Id*. at 1076 (emphasis added).

148.  Defendants Gerrans, Crowley, and Crenshaw focused their investigation exclusively on Mr. Caldwell before obtaining any actual evidence against him whatsoever.

149.  Defendants Gerrans, Crowley, and Crenshaw continued to investigate him even after they knew or should have known that Mr. Caldwell was innocent.  They also used techniques that they knew or should have known would yield false information, and Defendant Crenshaw actually fabricated a report in which he deliberately fabricated statements from Mr. Caldwell.

150. Defendants Gerrans, Crowley, and Crenshaw knew or should have known that Mr. Caldwell was innocent based on Mary Cobbs' first statement.  She told Defendant Gerrans that the shooters did not live in the area, and that she had heard they were from Sunnydale or Hunter's Point.  Defendant Crenshaw knew, and Defendants Gerrans and Crowley knew or should have known that Mr. Caldwell was from the Alemany Projects and that he had lived in the apartment next to Ms. Cobbs' apartment.  The San Francisco Police Department had even returned property to Mr. Caldwell that they had confiscated from 949 Ellsworth Street, the

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1    apartment next to Ms. Cobbs, and had a received a complaint about the living situation at 949

2    Ellsworth Street that indicated that Mr. Caldwell was living there.

3        151.  Further, although Ms. Cobbs was clearly attempting to cooperate with Defendant

4    Gerrans, she in no way indicated that the shotgun shooter was the man whom Defendant

5    Crenshaw had brought to her door in his custody, or that she knew the shooter as "Twone" and

6    that he may be the man whom Defendant Crenshaw was talking about when he said, "This is

7    Maurice Caldwell, Twone, the guy I've been telling you about."  Instead, she told Defendant

8    Gerrans that she did not know the shooters' names or nicknames.

9        152.  Still Defendants Gerrans and Crowley continued to focus their investigation solely

10   on Mr. Caldwell, returning to Ms. Cobbs with a photographic lineup that included Mr.

11   Caldwell's photograph.  When Ms. Cobbs indicated that she knew Mr. Caldwell by his nickname

12   "Twone," Defendants Gerrans and Crowley did not even question why Ms. Cobbs had not

13   previously told Defendant Gerrans that she knew the shooter as "Twone" or even worse, why she

14   told them she did not know the shooters' nicknames.  Instead, Defendant Gerrans confirmed to

15   her that she had selected "the man with the shotgun, Maurice Caldwell" and that he was "the

16   suspect."

17       153.  Defendant Crenshaw interviewed Mr. Caldwell and fabricated a report about the

18   conversation.  "If, under _Devereaux,_ an interviewer who uses coercive interviewing techniques

19   that are known to yield false evidence commits a constitutional violation, then an interviewer

20   who deliberately mischaracterizes witness statements in her investigative report also commits a

21   constitutional violation."  _Costanich v. Department of Social & Health Services_, 627 F.3d 1101,

22   1111 (9th Cir. 2010).  Defendant Crenshaw deliberately falsified statements that he reported Mr.

23   Caldwell had made.  Mr. Caldwell denied any involvement in the crime and told Defendant

24   Crenshaw he did not know anything about it, and yet Defendant Crenshaw reported that Mr.

25   Caldwell said, "that he was present at the shooting, but was down the street.  Prior to the

26

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1   shooting Caldwell was with the suspects dealing drugs [but walked away prior].[4]" Even a

2   personal belief in a suspect's guilt "does not permit or excuse deliberate falsification of

3   evidence." *Costanich v. Department of Social & Health Services*, *supra*, 627 F.3d at 1111.

4       154.  "Including a fabricated conversation in a police report would appear, by definition,

5   to qualify as a technique that a police officer should know yields false information." *Atkins v.*

6   *County of Riverside*, 151 Fed.Appx. 501, 506, (9th Cir. 2005), citing *Devereaux, supra*, 263 F.3d

7   at 1075.

8       155.  Defendants Gerrans and Crowley interviewed Mr. Caldwell twice, and both times,

9   Mr. Caldwell agreed to speak to them and told them the truth – that he was not involved.

10      156.  The first time Mr. Caldwell spoke to Defendants Gerrans and Crowley, he asked

11  them why officers were continuing to question him about this crime.  Defendants Gerrans and

12  Crowley told Mr. Caldwell that Defendant Crenshaw had informed them of the fabricated

13  statement described above, and claimed that they were investigating him on that basis.  Mr.

14  Caldwell told Defendants Gerrans and Crowley that he had not made any such statement, that he

15  told Defendant Crenshaw he was not involved, and that Defendant Crenshaw was constantly

16  after him and Mr. Caldwell had filed a citizen's complaint against him prior to the shooting.  Still

17  Defendants Gerrans and Crowley continued their investigation focused solely on Mr. Caldwell

18  and continued to include Defendant Crenshaw in their investigation.

19      157.  Defendants Gerrans, Crowley and Crenshaw were never able to develop any reliable

20  evidence against Mr. Caldwell despite their continued efforts.  In fact, nothing other than Ms.

21  Cobbs' unreliable identification of Mr. Caldwell secured by an impermissibly suggestive

22  procedure and Defendant Crenshaw's fabricated statement ever linked Mr. Caldwell to the crime.

23  No physical or forensic evidence ever connected him to the crime, and no other witnesses and or

24  even the surviving victims ever identified him as one of the shooters.  To the contrary, every

25  other witness who was able to provide information told Defendants Gerrans and Crowley that

26

27  ────────────────

28  [4] The bracketed words were crossed out in the handwritten police report.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1  Marritte Funches was the actual killer, or that Mr. Caldwell was inside an apartment, upstairs

2  with a female when the shots were fired.

3       158.  Defendants continued to investigate Mr. Caldwell when they knew or should have

4  known that he was innocent.  Upon information and belief, Defendants Gerrans and Crowley

5  presented the case to the District Attorney for filing when they knew or should have known that

6  he was innocent.

7                              **SECOND CLAIM FOR RELIEF**

8  **JOINT ACTION/CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS – 42 U.S. C.**

9                         **§1983 –DUE PROCESS VIOLATIONS**

10        **(Against Defendants Crenshaw, Gerrans, Crowley, and DOES 1-10)**

11       159.  Plaintiff realleges paragraphs 1 through 158, as well as any subsequent paragraphs

12  contained in the complaint, as if fully set forth herein.

13       160.  Defendants Crenshaw, Gerrans, and Crowley were jointly and severally

14  responsible as detectives involved in investigating this case to gather information and evidence

15  regarding the incident, and to ensure that any eyewitness identification and statement was free

16  from fabrication, suggestion, or influence by police.

17       161.  Defendants Crenshaw, Gerrans, and Crowley, acting under color of state law,

18  conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the

19  Constitution and laws of the United States, as elaborated above.  Each act of improper influence,

20  as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

21       162.  More specifically, Defendant Crenshaw deliberately fabricated a report filled with

22  falsified statements wrongfully attributed to Mr. Caldwell. Despite Mr. Caldwell telling

23  Defendant Crenshaw that he was not involved in the shooting and that he knew nothing about the

24  crime, Defendant Crenshaw included in his report that Mr. Caldwell said, "that he was present at

25  the shooting, but down the street. Prior to the shooting Caldwell was with the suspects dealing

26  drugs [but walked away prior]." When Defendants Gerrans and Crowley interviewed Mr.

27  Caldwell he told them that the statements in Defendants' report were false and that he, Mr.

28

1  Caldwell, had filed a citizen's complaint against Crenshaw prior to the murder of Mr. Acosta.

2  Knowing there was a possibility that Defendant Crenshaw, Defendants Gerrans and Crowley

3  continued to allow Defendant Crenshaw to be involved in the homicide investigation. This was

4  an overt act in furtherance of said conspiracy to prosecute and convict Mr. Caldwell, an innocent

5  man.

6  163. Alternatively as joint actors with joint obligations, each of them was and is

7  responsible for the failures and omissions of the other.

8  164.   As a result of defendants', and each of their, violations of Mr. Caldwell's

9  constitutional rights as alleged above, Mr. Caldwell was damaged as alleged above.

10  **THIRD CLAIM FOR RELIEF**

11  **DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. §1983 – MONELL VIOLATIONS**

12  **(Against Defendant City of San Francisco)**

13  165.  Plaintiff realleges paragraphs 1 through 164, as well as any subsequent paragraphs

14  contained in the complaint, as if fully set forth herein.

15  166. A municipality is liable for the constitutional deprivations of an individual where its

16  officials or employees, acting under color of law, deprived a person of their particular rights

17  under the constitution and where: the officials or employees acted pursuant to an adopted policy,

18  custom, or practice; the acts of a final policy maker deprived a person of their constitutional

19  rights by knowing about and approving of an employees' acts or omissions; or the constitutional

20  deprivations were a result of the municipality's failure to train its employees to handle the usual

21  and recurring situations with which they must deal. *Monell v. Department of Social Services*, 436

22  U.S. 658 (1978).

23  167."[A] local government's decision not to train certain employees about their legal duty

24  to avoid violating citizens' rights may rise to the level of an official government policy for

25  purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

26  168.To prevail on a failure to train or supervise claim, a Plaintiff must show that (1) he

27  was deprived of a constitutional right, (2) the City had a training policy that "'amounts to

28

32

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

1    deliberate indifference to the [constitutional] rights of the persons' with whom [its police

2    officers] are likely to come into contact"; and (3) his constitutional injury would have been

3    avoided had the City properly trained those officers. *Blankenhorn v. City of Orange,* 485 F.3d

4    463, 484 (9th Cir. 2007) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388–89 (1989)).

5        169.  Mr. Caldwell was deprived of his constitutional right to due process as discussed

6    above, which resulted in his serving more than 20 years for a crime he did not commit.

7        170.  The San Francisco Police Department's ("SFPD") and CITY's failure to train its

8    officers in the bounds of constitutionally permissive identification amounted to deliberate

9    indifference to the constitutional rights of those whom police officers are likely to come into

10   contact with.

11       171.  Upon information and belief, the SFPD had had no established or clear policy

12   regarding the following issues pertaining to eyewitness identification: a) ensuring that

13   eyewitness identification procedures complied with the requirements of due process, including

14   those set out in *Manson v. Braithwaite* and *Neil v. Biggers*; b) ensuring that police personnel,

15   whether through inadvertence or design, did not provide information to potential eyewitnesses

16   that influenced the identification; c) fully and completely documenting police personnel's

17   interactions with eyewitnesses; d) training police personnel regarding the constitutional bounds

18   of identification procedures and their obligations to provide prosecutor(s) eyewitness

19   identification information that is exculpatory in the case in which the in which the eyewitness

20   was making an identification; and e) supervising police personnel in the provision of eyewitness

21   identification information that is exculpatory to the prosecutor(s) in the case in which the

22   eyewitness was making an identification.

23       172.  Any such policies the SFPD employed were woefully inadequate to protect from

24   foreseeable violations of constitutional rights.  Not only were any such titular policies not

25   implemented or followed, but also the SFPD had a custom and practice of failing to ensure and

26   train their officers in the practices set out in paragraph 168.

27

28

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

173.  In *Manson/Biggers* and their progeny, the Supreme Court held that the admission of unreliable eyewitness identifications resulting from unnecessarily suggestive procedures violates due process.  The United States Supreme Court and lower courts have long recognized the risks of erroneous identifications and wrongful conviction inherent in suggestive identification procedures.

174.  Moreover, as explained in *Connick v. Thompson*, *supra*, in *Canton v. Harris*, the Supreme Court left open the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under §1983 without proof of a pre-existing pattern of violations.  131 S.Ct, at 1361.  The Court explained that such a scenario would require an obvious need for specific legal training, which was absent in *Connick* because lawyers and more specifically prosecutors are trained in the Constitution and *Brady* obligations and thus the need for specific training is not obvious.  *Id*., at 1361-1363.

175.  Like the situation hypothesized in *Canton* where police officers are given guns but not trained in the constitutional bounds of excessive force, in this case, police officers obviously require training in the constitutional bounds of unnecessarily suggestive identification procedures as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972), especially where officers constantly come into contact with eyewitnesses and use suggestive and improper procedures as a matter of course.

176.  "There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of [suggestive eyewitness identification procedures].  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require.  Under those circumstances there is an obvious need for some form of training." *Connick v. Thompson*, 131 S. Ct. 1350, 1361.

177.  San Francisco police officers are not lawyers trained in the specifics of due process. As discussed above, SFPD did not implement policies necessary to train its officers in the bounds of permissible identification procedures in order to prevent foreseeable constitutional violations.

178.  These constitute circumstances in which the need to train is obvious in order to protect the constitutional rights of those with whom police are likely to come into contact.

179.  Defendant CITY's failure to train its officers was the motivating force behind the violations of Mr. Caldwell's constitutional rights, and those violations could have been avoided had CITY properly trained its officers.

180. Ms. Cobb's erroneous identification was the result of Defendant's implementation of unnecessarily suggestive procedures and was the only evidence relied on to wrongfully convict Mr. Caldwell.

181.  The City of San Francisco and the San Francisco Police Department had a custom and practice of failing to adequately investigate and act upon complaints about officer conduct, including but not limited to complaints alleging retaliation, intimidation and fabrication of evidence, and failing to monitor and discipline officers for their unlawful conduct, thereby encouraging officers to engage in such conduct with impunity, and final policy makers ratified this misconduct.

## FOURTH CLAIM FOR RELIEF

### FAILURE TO INTERVENE –42 U.S.C. §1983

### (Against All Defendants)

182.  Plaintiff realleges paragraphs 1 through 181, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

183.  During the constitutional violations described herein, Defendants Crenshaw, Gerrans, Crowley, or DOES 1-10, stood by without intervening to prevent the misconduct.

184.  Defendants Crenshaw, Gerrans, and Crowley had physical interaction with Mr. Caldwell, and also had knowledge of and control over much of the challenged conduct.

185.  Specifically, Defendant Gerrans brought an untrained narcotics officer with a personal vendetta against Mr. Caldwell to assist with a homicide investigation.

186.  When Defendant Crenshaw brought Mr. Caldwell to Ms. Cobbs' front door, identified him by name and nickname and indicated that he was arresting him, Defendant

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

Gerrans did not intervene to cure the taint or suggestiveness of these actions.  In fact, rather than telling Ms. Cobbs that Defendant Crenshaw had retained Mr. Caldwell in relation to something else so as to cure some of the taint, Defendant Gerrans told Ms. Cobbs that the officer at the door was working with him, thereby further suggesting that Mr. Caldwell was their suspect and they had information upon which to arrest him for the murder.

187.  It is unclear who took the lead on this investigation, but neither Defendant Gerrans, nor Defendant Crowley intervened to stop the suggestive identification procedure from continuing.  Instead, they returned to Ms. Cobbs and presented Mr. Caldwell to her once again. Neither Defendant intervened to record the identification procedure and instead only turned on the tape recorder once they had obtained an identification of Mr. Caldwell.  Neither Defendant Gerrans, nor Defendant Crowley, intervened to prevent any part of the suggestive identification procedure, nor did either attempt to cure any of the many impermissibly suggestive portions of the identification procedure.  In fact, neither even questioned Ms. Cobbs about how her identification of Mr. Caldwell contradicted her initial statement to Inspector Gerrans.

188.  Defendant Crowley did not intervene to stop Defendant Gerrans from improperly confirming to Ms. Cobbs that she had selected "the suspect" and "the man with the shotgun," tainting that identification and all subsequent ones as well.

189. Defendant Gerrans and Crowley also failed to intervene after Mr. Caldwell told them that Defendant Crenshaw had attributed fabricated inculpatory statements to Mr. Caldwell in his report. Furthermore, Defendants Gerrans and Crowley continued to allow Defendant Crenshaw to participate in the homicide investigation after learning that Mr. Caldwell had filed a citizen's complaint against Defendant Crenshaw prior to Mr. Acosta's murder. The mere knowledge that there was already a complaint against Defendant Crenshaw for potential violations of Mr. Caldwell's constitutional rights should have led to Defendants Gerrans and Crowley intervening to protect the integrity of the homicide investigation by insulating the investigation from Defendant Crenshaw, who is not even trained in homicide investigations.

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

However, once again, Defendant's Gerrans and Crenshaw failed to intervene to protect Mr. Caldwell's constitutional rights.

190.  As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.  These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

191.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Maurice Antwone Caldwell, requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.      General and compensatory damages in an amount according to proof;

2.      Special damages in an amount according to proof;

3.      Exemplary and Punitive damages against each Defendant, except the City of San Francisco, in an amount according to proof;

4.      Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

5.      Such other relief as may be warranted or as is just and proper.


DATED: September 14, 2015          GROSS BELSKY ALONSO LLP


By:_____/s/ Terry Gross_____
          TERRY GROSS

Attorneys for Plaintiff
MAURICE CALDWELL

PLAINTIFF'S SECOND AMENDED COMPLAINT; CASE NO.: 12-cv-1892 EDL

## PROOF OF SERVICE

**RE:**       ***Maurice Caldwell v. City of San Francisco, et al.***
              **Case No.: 12-cv-1892 EDL**

       I am a citizen of the United States and employed in the County of San Francisco, State of California. I am over eighteen (18) years of age and not a party to the above-entitled action. My business address is GROSS BELSKY ALONSO LLP, 1 Sansome Street, Suite 3670, San Francisco, CA 94104. On the date set forth below, I served the following documents in the manner indicated on the below named parties and/or counsel of record:

- **PLAINTIFF'S SECOND AMENDED COMPLAINT**

<u>XX</u>    **By ECF:** by USDC Live System-Document Filing System on all interested parties registered for e-filing.

**Sean F. Connolly**
(Sean.connolly@sfgov.org)                    Attorneys for Defendants
**Newton Oldfather**
(newton.oldfather@sfgov.org)
**Brad Russi**
(Brad.russi@sfgov.org)
**Diana Rosenstein**
(Diana.rosenstein@sfgov.org)
City Attorney's Office; City of San Francisco
1390 Market Street, 6th Floor
San Francisco, CA 94102
Tel: (408)554-3863
Fax: (415) 554-3837

       I am readily familiar with the firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service, and said correspondence would be deposited with the United States Postal Service, California that same day in the ordinary course of business.

       I declare under penalty of perjury that the foregoing is true and correct. Executed on September 14, 2015 at San Francisco, California.

                        ___/S/ Jessica Dean_____.
                        JESSICA DEAN