UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAURICE CALDWELL,

Plaintiff,

v.

CITY OF SAN FRANCISCO, et al.,

Defendants.

Case No. 12-cv-01892-DMR

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM**

Re: Dkt. No. 423

Plaintiff Maurice Caldwell spent nearly 20 years in prison following his 1991 conviction for second degree murder.  He was released in 2011 after a state court granted his petition for a writ of habeas corpus on the basis of ineffective assistance of counsel.  Following his release, Caldwell filed this lawsuit alleging that three officers of the San Francisco Police Department ("SFPD") fabricated evidence against him during the murder investigation.  He also alleged a claim for municipal liability pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against Defendant City and County of San Francisco ("San Francisco").

This case was originally assigned to the Honorable Elizabeth D. Laporte.  In March 2016, the court granted summary judgment on Caldwell's claims against Defendants Kitt Crenshaw, Arthur Gerrans, and James Crowley.  The court did not reach the *Monell* claim, finding that it was not viable absent claims against the individual officers.  [Docket No. 373.]  In 2018, the United States Court of Appeals for the Ninth Circuit affirmed as to Gerrans and Crowley and reversed as to Crenshaw, finding triable issues of fact regarding whether Crenshaw fabricated evidence and whether such fabrication caused Caldwell's injury.  *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112-18 (9th Cir. 2018).  The court returned the case with instructions to address the *Monell* claim on remand.  *Id.* at 1108 n.2.

United States District Court
Northern District of California

Following Judge Laporte's retirement, the case was reassigned to the undersigned. Crenshaw and San Francisco now move for summary judgment on Caldwell's *Monell* claim. [Docket No. 423.]  The court held a hearing on October 1, 2020 and ordered the parties to file supplemental briefing, which the parties timely filed.  [Docket Nos. 465, 467, 468, 471.]  For the following reasons, Defendants' motion is granted in part and denied in part.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## A.     Facts from the Ninth Circuit's Opinion

The facts of this case were discussed in detail in Judge Laporte's March 2, 2016 Order Granting Defendants' Motion for Summary Judgment and the Ninth Circuit's subsequent decision. The following discussion of the relevant facts is excerpted from the Ninth Circuit's opinion:

### A. The Acosta Murder and Caldwell's Conviction

On June 30, 1990, a group of four persons, including Judy Acosta and Domingo Bobila, went to a San Francisco housing project to buy drugs.  There, a group approached Acosta and Bobila, offering to sell crack.  The sale went wrong and one of the dealers pulled out a handgun and shot Acosta in the chest.  Bobila tried to flee in his car and a second man began firing a shotgun.  Bobila and Acosta were hit by shotgun fire and Acosta died in the car.  Caldwell claims that he was not present at the shooting; Defendants claimed that Caldwell was the shotgun shooter.

In March 1991, a jury convicted Caldwell of second-degree murder for shooting Acosta with the shotgun.  Mary Cobbs testified at trial and identified Caldwell as the shotgun shooter.  A few months afterwards Cobbs and her children received roundtrip tickets to Disneyland from the San Francisco Secret Witness Program.

### B. The July 13, 1990 Canvass

On July 13, 1990, Inspector Gerrans, Sergeant Crenshaw, and Officer Robert Doss of the SFPD canvassed the housing project where the Acosta murder occurred.  The general purpose of the canvass was to, among other things, find

witnesses to the murder.  The day before, the police had received an anonymous tip that the police should "check out" Caldwell, "who had been shooting off guns in the projects ... for years."  During the canvass, Gerrans mentioned the name Caldwell to Crenshaw and Crenshaw said he knew him.

Caldwell and Crenshaw had history.  Caldwell had interacted with Crenshaw between six and nine times prior to the 1990 murder investigation. During these stops Caldwell said that Crenshaw would tell him things such as, "[h]e [sic] going to catch me, and when he do catch me, he going to end up killing me or he going to have me in jail for the rest of my life, you know."  Five months before the murder, Caldwell filed a complaint with the Office of Citizen Complaints ("OCC") against Crenshaw.  During the OCC's investigation, Crenshaw admitted telling Caldwell:

> One day I'm going to be sitting up there and you're going to be blown away. Something's going to happen to you because sooner or later I'm going to catch you with a gun and you and I are going to have it out. I'm going to kill you. Next time we're going to get the drop on you.

Gerrans later testified that had he known about Crenshaw and Caldwell's history, he may have had second thoughts about Crenshaw being involved in the investigation.

Gerrans met Cobbs during the course of the canvass.  Cobbs had witnessed the shooting and agreed to an interview with Gerrans.  During the interview, Cobbs stated that the shooters did not live around her, but that she recognized them from seeing them in the area a few times.  Cobbs said she did not know the shooters' names or nicknames.  Cobbs gave a description of the shotgun shooter as a 5'4"', 150-pound, African-American man that wore his hair in a jheri curl.  Caldwell had an apartment next door to Cobbs' and may have lived there.

### 1. The Alleged Show-up at Cobbs' Door

During the July 13, 1990, canvass, Crenshaw saw Caldwell on the street and approached him.  In Caldwell's retelling, Crenshaw knew that Gerrans was

interviewing a potential witness and marched Caldwell to Cobbs' door.  At the door Crenshaw knocked, Cobbs answered, and Crenshaw asked if the homicide inspector was there.  Caldwell and Cobbs made eye contact.  According to Caldwell, once Gerrans came to the door, Crenshaw stated "this is Maurice Caldwell, or Twone, right here.  And can I have your keys?" Crenshaw asked for Gerrans' keys despite having his own car nearby.  Andrena Gray, Caldwell's girlfriend at the time, corroborated Caldwell's story in a later-filed declaration, stating Crenshaw "forcibly walked [Caldwell] down the street, and stopped in front of the door of an apartment, which I later learned was the apartment of Mary Cobbs."

Caldwell alleges that Crenshaw manufactured this show-up to manipulate Cobbs into falsely identifying Caldwell as the shooter.  Defendants do not dispute that Crenshaw knocked on Cobbs' door while Gerrans was interviewing the witness, but they all contend that Caldwell was not with Crenshaw at the door.

### 2. The Conversations between Caldwell and Crenshaw

Caldwell and Crenshaw spoke to one another two different times during the canvass.  The men tell different stories.  First, Crenshaw confronted Caldwell in the street.  It was during this encounter on the street that, according to Crenshaw, Caldwell made a "spontaneous statement" about being present at the shooting and dealing drugs.  The second encounter between Crenshaw and Caldwell took place in Gerrans' car and Crenshaw told Caldwell that homicide wanted to talk to him.

According to Caldwell, on the street, he asked Crenshaw, "why do you harass me?"  In the car, Crenshaw asked "what do you know about a murder?" and Caldwell responded, "I don't know nothing about nothing."  Crenshaw then allegedly asked Caldwell where he was the night of the murder and Caldwell replied that he was at his uncle's house.  From these encounters, Crenshaw later wrote the following notes:

1
2
3
4
5

> Maurice Caldwell stated that he was present at the shooting, but he was down the street. Prior to the shooting. Caldwell was with the suspects dealing drugs. After the shooting Caldwell returned and started yelling at the shooters, he did this because he felt he was going to be blamed. He further stated he knew why I stopped him, because 'anytime somebody does any shooting it's usually me.' 'But that was before, I don't do that any more [sic].'

6  Caldwell denies having said any of this and alleges that Crenshaw

7  fabricated the statement and falsified the notes.

8  **C. The July 26, 1990 Photo Lineup**

9  On July 25, 1990, Cobbs tried to cancel a scheduled photo lineup, stating

10 that she had been threatened for cooperating with the police.  Gerrans convinced

11 Cobbs to come in regardless.

12 On July 26, 1990, Cobbs met with Gerrans and Crowley.  Gerrans and

13 Crowley then performed a non-videotaped photo lineup.  Recording a photo

14 lineup would have been the department's "number one choice" in 1990, but there

15 is no evidence that it was required by policy.  After Cobbs apparently picked

16 Caldwell out of the photo lineup as the shotgun shooter, the officers turned on a

17 camera and conducted the photo lineup again.  Once the camera was rolling,

18 Cobbs picked Caldwell again and said that she had heard that people call him,

19 "Twan."

20 After the photo lineup, the officers asked Cobbs to recount what she saw

21 the night of the shooting.  During Cobbs' retelling, the officers interjected with

22 statements, such as "this is the man you saw out front of your house the night of

23 the shooting and he had a shotgun.  Is that correct?"  Later, the officers asked,

24 "[t]he man that you saw, you picked out in this picture here, the man with the

25 shotgun, he was still shooting the shotgun as the car was leaving?"  Finally, the

26 officers referenced Caldwell by name: "When you went to the window, you

27 recognized this man and I'm turning over the picture of Maurice Caldwell SF No.

28 445392.  That's the man that you recognized. 'Cuz you saw him in the area

before, right?"

The officers also discussed that people had threatened Cobbs for cooperating with the police.  During Gerrans' deposition, Caldwell's attorney asked, "Did you say to [Cobbs] ... [that] the police department would take efforts to protect her [from threats] if she was able to help you in ID'ing this person as a suspect?"  To which Gerrans replied, "I believe that was said."  Gerrans continued "we didn't go into witness ... relocation or anything like that.  We didn't promise her anything at that time.  We promised we would take care of her to protect her."

### D. The Prosecutor's Actions

Assistant District Attorney, Alfred Giannini, prosecuted Caldwell.  In support of Defendants' motion for summary judgment, Giannini filed a declaration describing his investigation in the case.  Giannini declared that he authorized charges against Caldwell on September 20, 1990, after reviewing all the evidence available to him.  Before the preliminary hearing on December 3, 1990, Giannini interviewed a number of witnesses and did not believe they had been coached.  At the preliminary hearing, in response to Caldwell's attorney's questioning of Cobbs, Giannini considered, for the first time, whether Cobbs had seen Caldwell during the alleged show-up, but "determined that Ms. Cobbs had not seen Mr. Caldwell, and ... decided that even if she had, it hadn't undermined the reliability or veracity of her testimony."  Giannini further stated, that although he did not elicit any evidence about Caldwell's July 13, 1990, statement at trial, he initially considered the "inconsistency" between that statement and Caldwell's September 21, 1990, statement, but "decided it was a minor factor when reviewing the totality of the evidence."

*Caldwell*, 889 F.3d at 1109-11 (footnotes omitted).

Caldwell filed a petition for writ of habeas corpus in 2009.  [Docket No. 427 (Defs.' Request for Judicial Notice, "RJN") Ex. G.][1]  He argued that he was entitled to the writ based on

---

[1] Defendants ask the court to take judicial notice of various public records and state court filings related to Caldwell's conviction, appeal, and petition for writ of habeas corpus.  Caldwell does not

newly discovered evidence of his innocence, including a sworn declaration by Marritte Funches confessing to the crime; false testimony by Cobbs; and ineffective assistance of counsel, among other things. *See id*. On December 15, 2010, the San Francisco County Superior Court granted the petition, finding that Caldwell had received ineffective assistance at trial based on his counsel's failure to investigate his claim of innocence, including the failure to speak with potential alibi witnesses and other eyewitnesses to the shooting. RJN Ex. M. The court did not rule on the other grounds raised in the habeas petition. *See id*. Caldwell was released from custody in March 2011.

### B.      Additional Facts Relevant to the Present Motion

As the Ninth Circuit noted, Caldwell filed a complaint against Crenshaw with the OCC in January 1990, six months before the Acosta shooting. The OCC is the SFPD's civilian oversight department. *See Caldwell*, 889 F.3d at 1109. In his OCC complaint, Caldwell described an interaction with Crenshaw that took place on January 24, 1990. [Docket No. 439 (Gross Decl., June 30, 2020) ¶ 4 Ex. C (Caldwell's OCC Compl.).] Caldwell wrote that Crenshaw and two other SFPD officers pulled him out of a parked vehicle and threw him on the ground, where Crenshaw kicked him in the face and other officers grabbed and hit him. According to Caldwell, the officers then drove him to a different location where Crenshaw "informed me if I didn't tell him where a shotgun was at, he was going to send me to the hostpital [sic] or kill me." Crenshaw then started choking him to the point where Caldwell could not breathe and threw him to the ground. *Id*. at CCSF_CALDWELL_002985-89. During the OCC investigation of Caldwell's complaint, Crenshaw admitted that he threatened to kill Caldwell in the presence of other officers while at the police station. Gross Decl. ¶ 3, Ex. B (Crenshaw Dep.) 129, 143-44; Caldwell's OCC Compl. at 005083-84.[2] *See also Caldwell*, 889 F.3d at 1109.

---

object. Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). The court concludes that the state court proceedings are "directly related" to the issues in this action. Accordingly, the court takes judicial notice of Exhibits A through N.

[2] All further references to bates numbers are to documents with the prefix "CCSF-CALDWELL" unless otherwise noted.

United States District Court
Northern District of California

The OCC issued its findings on Caldwell's complaint against Crenshaw in July 1991. [Docket No. 446 (Fischer Decl., June 29, 2020) ¶ 132.] *See also* Caldwell's OCC Compl. at 005078-86. It concluded that Caldwell's allegations that Crenshaw used "unnecessary force" and threatened to send him to the hospital or kill him were unfounded, but sustained a different claim that was not part of Caldwell's complaint, that Crenshaw later threatened to kill Caldwell at the police station. *Id*. at 005084-85. SFPD Police Chief Willis A. Casey held a Chief's Disciplinary Hearing on September 12, 1991 regarding the OCC findings. He declined to discipline Crenshaw, determining that "Crenshaw's comments at the station were not reflective of misconduct on the department." Fischer Decl. ¶ 133, Ex. 23 at 004949-50.

Caldwell presents evidence that individuals filed at least 66 OCC complaints against Crenshaw over an unspecified period of time. Fischer Decl. ¶ 72. From 1987-1989, the years immediately preceding Caldwell's arrest for Acosta's murder, 25 OCC complaints were filed against Crenshaw, none of which were sustained. *Id*. at ¶ 74. Crenshaw testified that he did not recall receiving discipline or counseling as a result of OCC complaints, although it appears that he received written reprimands in 1980 and 2003. *Id*. at ¶ 74-75.

### C. Procedural History

Caldwell alleged the following claims in the SAC, which is the operative complaint: 1) a 42 U.S.C. § 1983 claim for violation of his Fifth and Fourteenth Amendment due process rights based on fabrication of evidence and use of an impermissibly and unnecessarily suggestive identification procedure; 2) a section 1983 claim for conspiracy to interfere with Caldwell's civil rights; 3) a claim for municipal liability under *Monell* against San Francisco; and 4) a section 1983 claim for failure to intervene.

On March 2, 2016, the court granted Defendants' motion for summary judgment. [Docket No. 373.] The court held that Caldwell had failed to raise a triable issue as to whether Gerrans or Crowley had deliberately fabricated evidence. *Id*. at 18-25. It also held that Caldwell raised a triable issue as to whether Crenshaw manufactured the show-up at Cobbs's front door to manipulate her into identifying Caldwell and deliberately fabricated a statement by Caldwell placing him at the shooting. However, the court determined that Crenshaw was not liable because

United States District Court
Northern District of California

United States District Court
Northern District of California

the prosecutor's decision to charge Caldwell was subject to a presumption of independence, and therefore broke the chain of causation between Crenshaw's alleged actions and Caldwell's harm. *Id*. at 14-17, 25-33.  The court also granted summary judgment on Caldwell's second and fourth claims for conspiracy and failure to intervene based on its finding that Crowley and Gerrans did not violate Plaintiff's constitutional rights and that the prosecutor's decision to prosecute immunized Crenshaw from liability.  *Id*. at 33-34.  Because the court granted summary judgment as to the individual defendants, it did not reach Defendants' motion regarding the *Monell* claim. *Id*. at 34.

Caldwell appealed.  On May 11, 2018, the Ninth Circuit affirmed as to Gerrans and Crowley, but reversed with respect to Crenshaw.  The court upheld the district court's ruling that there were triable facts regarding whether Crenshaw manufactured a show-up at Cobbs's front door, and whether Crenshaw brought Caldwell to Cobbs's door for the purpose of fabricating evidence against Caldwell.  *Caldwell*, 889 F.3d at 1113-14.  It also held that Caldwell raised a dispute of fact with respect to whether Crenshaw deliberately fabricated a statement from Caldwell and memorialized it in falsified notes.  *Id*. at 1114-15.

The Ninth Circuit addressed the issue of causation by noting that "[t]o establish causation, Caldwell must raise a triable issue that the fabricated evidence was the cause in fact and proximate cause of his injury."  *Id*. at 1115 (citing *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017)).  It further stated that in constitutional tort cases, "the '[f]iling of a criminal complaint immunizes investigating officers . . . because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."  *Id*. (quoting *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981)) (alteration and ellipses in original).  The court concluded that "[a]ssuming without deciding that the presumption applies to [fabrication of evidence] claims . . . Caldwell sufficiently rebutted any presumption and has established a triable issue as to causation."  *Id*. at 1116.  Specifically, the court found that Caldwell had raised a dispute of fact as to whether San Francisco's prosecutor, Assistant District Attorney Alfred Giannini, relied on "the falsehood" of Cobbs's identification of Caldwell and Crenshaw's notes in making the decision to charge Caldwell.  *Id*. at 1116-18.  The Ninth Circuit returned the

case to the district court with instructions to address Caldwell's *Monell* claim on remand.  *Id*. at 1108 n.2.  Therefore, what remains is a due process claim against Crenshaw for fabrication of evidence and the *Monell* claim against San Francisco.

The Ninth Circuit's judgment took effect on March 19, 2019.  Caldwell filed the Circuit Clerk's mandate on November 25, 2019.  [Docket No. 404.]  The matter was reassigned to the undersigned due to Judge Laporte's retirement.  [Docket Nos. 405, 406.]

The court conducted an initial case management conference on April 29, 2020 at which Defendants requested permission to file a motion to dismiss Caldwell's due process claim against Crenshaw based on what they represented to be an intervening change in the law.  The court set a filing deadline for the motion to dismiss as well as Defendants' motion for summary judgment on the *Monell* claim.[3]  [*See* Docket Nos. 414, 415.]

Defendants timely filed the instant motion, but the parties' submissions were problematic.  [Docket No. 423.]  Inexplicably, Defendants moved for summary judgment on the claim against Crenshaw, even though they did not seek and were not granted leave to do so.  Caldwell's response to Defendants' motion did not comply with the Local Rules, including filing two separate opposition briefs, filing a separate nine-page "motion to strike" containing evidentiary objections, and violating font size requirements.  The court denied Defendants' motion for summary judgment as to Crenshaw for being filed without leave of court.  The court also struck Caldwell's opposition, Defendants' reply, and the briefing on Caldwell's motion to strike.  It ordered Caldwell and Defendants to file amended opposition and reply briefs with respect to the motion on the *Monell* claim.  [Docket No. 456.]  The parties timely filed their amended submissions.

## II.     EVIDENTIARY OBJECTIONS

### A.  Caldwell's Objections

Caldwell objects to three categories of evidence offered by Defendants.

First, Caldwell moves pursuant to Federal Rule of Civil Procedure 37(c)(1) to exclude the

---

[3] Defendants filed a motion to dismiss the SAC, which the court denied on October 26, 2020. *Caldwell v. City of San Francisco*, No. 12-CV-01892-DMR, 2020 WL 6270957 (N.D. Cal. Oct. 26, 2020).

United States District Court
Northern District of California

1    November 2, 2015 declaration of SFPD Sergeant Rachael Kilshaw and the exhibits thereto.  In her

2    declaration, Kilshaw discusses the OCC.  Her testimony includes the history and mission of the

3    OCC, rules and procedures regarding the investigation of citizen complaints of police misconduct,

4    and the OCC's maintenance of records regarding such complaints.  She also authenticates several

5    documents, including rules and policies promulgated by the OCC around 1983 that were in effect

6    in 1990; SFPD General Orders governing complaints against members of the SFPD, the conduct

7    of its members, and the discipline and counseling of its members; a yearly report of the OCC from

8    1990; and SFPD policies and training materials.  [Docket No. 425-15 (Kilshaw Decl., Nov. 2,

9    2015).]

10       Caldwell argues that the Kilshaw declaration and exhibits should be excluded.  He

11   contends that Defendants failed to disclose Kilshaw as a witness in their initial disclosures under

12   Federal Rule of Civil Procedure 26(a).  [Docket No. 459 (Supp. Gross Decl., Aug. 31, 2020) ¶ 2.]

13   Caldwell further argues that during discovery, he served a notice of deposition for a person most

14   knowledgeable regarding "[t]he policies, practices and procedures of the OCC between January 1,

15   1985 and December 31, 2000, including those investigations of complaints, resolutions of

16   complaints, disciplinary action, record keeping, and standards and rules of conduct."  *Id.*

17   According to Caldwell, San Francisco responded "that it had no person with knowledge from this

18   time period, and [that] it would be too burdensome to prepare someone."  *Id.*  Caldwell moved to

19   compel the deposition in connection with his motion for leave to file a second amended complaint.

20   [Docket Nos. 130, 157.]  On August 26, 2015, the court granted Caldwell's motion to file a second

21   amended complaint but denied the motion to compel the deposition, finding persuasive

22   Defendants' argument "that preparing a witness on OCC policies, practices and procedures

23   stemming from the 1980s would be extremely burdensome."  [Docket No. 174.]  Caldwell now

24   argues that it would be unfair to consider Kilshaw's declaration given Defendants' prior successful

25   objection to a 30(b)(6) deposition on the topics which Kilshaw now discusses.  Caldwell also

26   objects to the exhibits attached to Kilshaw's declaration, arguing that he was unable to "test[ ] the

27   validity and veracity of these documents."  Opp'n 9.

28       Caldwell asserts that the court should disregard Kilshaw's declaration and exhibits under

United States District Court
Northern District of California

11

Rule 37(c)(1).  That rule provides that a party that "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Under Rule 26(a), a party must identify individuals "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses," as well as documents that it may use to support its claims or defenses.  Rule 26(e) requires a party to supplement or correct a Rule 26(a) disclosure or discovery response if it learns that the disclosure or response is incomplete or incorrect.

In response, Defendants argue that the Kilshaw declaration authenticates records related to SFPD training and the OCC, and that the OCC documents were produced in discovery.  They also assert that Caldwell's unsuccessful request for a Rule 30(b)(6) witness was much broader than the scope of Kilshaw's declaration, as it asked for a witness to address the OCC's policies, practices, and procedures for a 15-year period.  Defendants argue that the prior order denying the wide-ranging deposition does not justify excluding Kilshaw's declaration, particularly where Caldwell made no subsequent effort to seek a Rule 30(b)(6) witness on more focused topics.  *See* Reply 5-6.  Additionally, they note that the Rule 30(b)(6) notice made no mention of SFPD training materials; therefore, they argue, there is no basis for excluding those materials.

Kilshaw's declaration is largely limited to authenticating OCC-related documents and SFPD policies and training materials.  While it is undisputed that Defendants did not disclose Kilshaw as a Rule 26(a) witness and opposed Caldwell's attempt to depose a witness on the policies, practices, and procedures of the OCC for a 15-year period, Caldwell does not contend that any of the documents attached to her declaration are not authentic or were not produced in discovery.  Caldwell does not contend that Defendants refused to produce a witness to testify about SFPD training materials nor does he explain how allowing Kilshaw to authenticate the documents will prejudice him.  Accordingly, the court finds that Defendants' failure to identify Kilshaw for the limited purpose of authenticating documents in connection with this motion is harmless.  The objection to the portions of her declaration authenticating documents is overruled.  *See* Kilshaw Decl. ¶¶ 9-14, 18-34.

The statements in Kilshaw's declaration are not solely limited to authenticating documents, however.  For example, Kilshaw states that "[e]ach complaint received by the OCC is fully investigated by a staff of trained investigators," Kilshaw Decl. ¶ 8, even though Caldwell alleges that San Francisco failed to adequately investigate and act on citizen complaints against SFPD officers.  She also makes a broad, unbounded statement about SFPD's training practices, including that the SFPD "regularly trained and informed its members in all facets of investigation . . . consistent with the San Francisco Police Departments [sic] goal of maintaining the integrity of its investigations." *Id*. at ¶ 16.  These statements characterizing the work of the OCC and SFPD practices go beyond authentication and directly contradict Caldwell's allegations in this case.  However, the court need not resolve Caldwell's Rule 37(c)(1) challenge to this and other similar portions of her declaration at this time, as the court does not rely on the statements in deciding this motion.  Accordingly, Caldwell's objection to the remaining portions of Kilshaw's declaration is denied as moot.

Next, Caldwell moves pursuant to Rule 37(c)(1) to exclude Defendants' argument that "[t]he five complete OCC files produced in this case are too few to provide a foundation for a jury to find that OCC investigations before 1990 failed to meaningfully discipline officers of the SFPD," where the OCC received at least 6,500 complaints from 1985 through 1990.  *See* Mot. 16-17.  He states that he served a document request for all OCC complaints and investigative files concerning Crenshaw, but that Defendants produced only six complete files of pre-1991 complaints, including an OCC complaint by Caldwell.  Suppl. Gross Decl. ¶ 3.  Caldwell moved to compel production of all OCC complaints against Crenshaw.  [Docket No. 95.]  On May 26, 2015, the court granted Caldwell's motion in part.  The court ordered that Caldwell could "request three additional pre-March 1991 OCC investigatory files" and that the parties were to "meet and confer on the production of additional investigatory files, if any, including sharing of retrieval and copying costs."  [Docket No. 128.]  It further ordered that if the parties were unable to resolve the issue, "then if there is a showing of good cause by Plaintiff, the Court may order additional files produced and may impose cost-shifting or sharing."  *Id*.  According to Caldwell, San Francisco failed to comply with the court's order to produce the three additional OCC files that he requested.

1    Suppl. Gross Decl. ¶ 3.  He argues that having opposed his request for "a substantial number of

2    OCC investigative files," Defendants cannot now argue that the number of OCC complaints

3    produced are insufficient.

4        The objection to Defendants' argument is overruled.  The May 26, 2015 order did not

5    expressly order Defendants to produce additional OCC files, and nothing in the record indicates

6    that Caldwell subsequently made the required "showing of good cause" for the production of

7    additional files.

8        Finally, Caldwell moves to strike statements in Defendants' motion as irrelevant,

9    prejudicial, and inadmissible.  These statements are about Caldwell's alleged murder of Acosta

10   and actions in connection with his petition for writ of habeas corpus.  Opp'n 2 n.1, 7-8.  As the

11   court does not rely on this material in deciding Defendants' motion for summary judgment, the

12   request to strike is denied as moot.

13       **B.    Defendants' Objections**

14       Defendants object to the declarations of Caldwell's expert witnesses, Professor Halford

15   Fairchild and Russell Fischer.  Reply 2-5.  Fairchild offers opinions about the policing of Black

16   communities in San Francisco by the SFPD in 1990, including the opinion that young Black men

17   in San Francisco "were subject to aggressive policing and harassment" by SFPD officers and

18   when accused of a crime, "faced a substantial likelihood of being convicted."  [Docket No. 445

19   (Fairchild Decl., June 30, 2020) ¶ 5.]  Caldwell offers Fairchild's declaration in support of a

20   theory of *Monell* liability centered on the existence of systemic racism in the SFPD.  As discussed

21   below, this theory was not pleaded in the operative complaint and Caldwell may not raise it for the

22   first time in opposition to Defendants' motion for summary judgment.  Accordingly, Defendants'

23   objections to the declaration are denied as moot, as the court will not consider Fairchild's opinions

24   for the purpose of deciding this motion.

25       Defendants also object to portions of the declaration of Caldwell's police practices expert

26   Russell Fischer, including opinions supporting the improper *Monell* theory identified above.  The

27   objections to those opinions in paragraphs 8(c) and 8(d) of Fischer's declaration (Opinions 3 and

28

United States District Court
Northern District of California

1    4) are therefore denied as moot.[4]  The court also denies as moot Defendants' objections to Exhibits

2    28 and 29 to Fischer's declaration, which are part of Fischer's discussion of Opinions 3 and 4

3    (Fischer Decl. ¶¶ 166, 173).

4              Defendants' remaining objections are to the exhibits attached to Fischer's declaration.

5    They argue that Exhibits 2 through 14, 20, 22, and 26 are hearsay and that they are irrelevant

6    "because they do not address the time period at issue in the present case."  Reply 4.  Exhibits 2

7    through 14 include reports and studies of the SFPD and the OCC, including a 2002-2003 report by

8    San Francisco's civil grand jury regarding deficiencies in the OCC (Exhibit 2), a 2003 Office of

9    the Controller of the City and County of San Francisco report on the OCC (Exhibit 3), and a 2016

10   Department of Justice ("DOJ") assessment of the SFPD (Exhibit 14).  *See* Fischer Decl. ¶¶ 13-49,

11   Exs. 2-14.  Exhibit 20 is a 2001 DOJ study of early warning systems for police officers and

12   Exhibits 22 and 26 are International Association of Chiefs of Police model policies for early

13   warning systems and investigations of employee misconduct dated 2002 and 2001, respectively.

14   Fischer Decl. ¶¶ 89, 90, 140, Exs. 20, 22, 26.

15             Defendants' hearsay objection to these exhibits is overruled.  "[A]t summary judgment a

16   district court may consider hearsay evidence submitted in an inadmissible form, so long as the

17   underlying evidence could be provided in an admissible form at trial, such as by live testimony."

18   *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).  It is

19   possible that Caldwell could offer the facts underlying the exhibits in an admissible form at trial,

20   such as through the hearsay exception for public records.  *See* Fed. R. Evid. 803(8).  Moreover, it

21   is possible that the exhibits may be admissible under Federal Rule of Evidence 703, which permits

22   "hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to

23   explain the basis of the expert's opinion."  *Paddack v. Dave Christensen, Inc*., 745 F.2d 1254,

24   1261-62 (9th Cir. 1984).

25

26   _____

27   [4] These opinions are as follows: 1) that in 1990, there was a practice and procedure in the SFPD to systematically engage in racial profiling, racial discrimination, and excessive force against people of color; and 2) that in 1990, there was a practice and procedure of "cut[ting] corners" during

28   murder investigations involving young Black suspects and other persons of color.  Fischer Decl. ¶¶ 8(c), 8(d).

United States District Court
Northern District of California

1    Defendants' objections to these exhibits based on relevance are denied as moot, as the

2    court's analysis of Fischer's declaration is limited to the contemporaneous materials on which his

3    opinions are based (and to which Defendants do not object).  The court expresses no opinion at

4    this time about the relevance of materials dating years after the events at issue in this litigation.

5    **III.    SCOPE OF CALDWELL'S *MONELL* CLAIMS**

6    As an initial matter, the parties dispute the contours of Caldwell's *Monell* claim.

7    Defendants move for summary judgment on the three theories of *Monell* liability set forth in the

8    the operative complaint.  Mot. 14-22.  In the SAC, Caldwell makes the following allegations

9    regarding San Francisco's liability under *Monell*: first, he alleges that SFPD failed to train or

10   supervise its officers "in the bounds of constitutionally permissive [eyewitness] identification" in

11   order "to prevent foreseeable constitutional violations."  SAC ¶¶ 170, 177; *see also id*. at ¶¶ 96-97.

12   According to Caldwell, SFPD had no established or clear policies to ensure that eyewitness

13   identification procedures complied with the requirements of due process, and that any policies it

14   employed "were woefully inadequate to protect from foreseeable violations of constitutional

15   rights."  *Id*. at ¶¶ 171-72.

16   Next, Caldwell alleges that San Francisco and the SFPD failed to maintain an adequate

17   discipline system for police officers, and that they "had a custom and practice of failing to

18   adequately investigate and act upon complaints about officer conduct, including but not limited to

19   complaints alleging retaliation, intimidation and fabrication of evidence," which encouraged

20   officers "to engage in such conduct with impunity."  *Id*. at ¶ 181.  According to Caldwell, the

21   OCC system for responding to citizen complaints "was so broken and ineffective that police

22   officers rarely were disciplined for improper conduct."  *Id*. at ¶ 100.  For example, even though

23   citizens filed more than 60 OCC complaints against Defendant Crenshaw between 1991 and 2009,

24   the OCC sustained only one complaint, and Crenshaw was not disciplined for that incident.  *Id*.

25   Finally, Caldwell alleges that the "culture and practice . . . of tolerating unlawful conduct

26   by its officers . . . amounted to a ratification by the SFPD of such [unlawful] conduct by defendant

27   Crenshaw and other officers of the SFPD."  *Id*. at ¶¶ 101, 181.

28   In opposition, Caldwell describes different theories of municipal liability, two of which

United States District Court
Northern District of California

16

United States District Court
Northern District of California

center on allegations of systemic racism.  First, he contends that San Francisco had "a decades-long practice of not disciplining SFPD officers so they believed they could violate the rights of people of color," and that "systemic racism in the SFPD . . . permitted officers to knowingly violate constitutional rights of people of color with no consequences."  Opp'n 1, 13.  Second, he contends that "the SFPD acted with deliberate indifference to the systemic racism in its ranks by failing to train officers to respect the civil rights of persons of color in the City's housing projects," including "fully investigating crimes involving Black suspects," and that this failure to train "was a cause of Caldwell's wrongful arrest, prosecution, and conviction."  *Id*. at 1, 22.  Finally, Caldwell asserts that the SFPD police chief ratified Crenshaw's violation of his civil rights by failing to discipline Crenshaw for his threat to kill Caldwell in retaliation for filing a complaint with the OCC, and for failing to discipline Crenshaw in connection with other OCC complaints for threats and intimidation.  *Id*. at 1, 24.  He does not address, and thus concedes, any claims for municipal liability based on SFPD's alleged failure to train its officers in permissible eyewitness identification procedures.

On reply, Defendants object that Caldwell's "systemic racism" theories are not alleged in the SAC.  *See* SAC ¶¶ 170-71, 181.  They argue that Caldwell should not be permitted "to invent a new *Monell* theory after the close of discovery and after Defendants have moved for summary judgment based on the allegations of the SAC."  Reply 7.

Caldwell contends that paragraph 101 in the SAC put Defendants on notice that he alleges *Monell* liability based on SFPD's custom and practice of racial discrimination.  That paragraph states in full:

> The City of San Francisco and the San Francisco Police Department had a custom and practice of failing to adequately investigate and act upon complaints about officer conduct, including but not limited to complaints alleging retaliation, intimidation and fabrication of evidence, and failing to monitor and discipline officers for their unlawful conduct, thereby encouraging officers to engage in such conduct with impunity, and final policy makers ratified this misconduct.  The recent public announcement by the San Francisco District Attorney's Office that it is convening an investigation into the SFPD's culture and practice, reaching back for decades, of tolerating unlawful conduct by its officers, resulting in scores of unlawful arrests and wrongful convictions, **particularly among racial minorities**, underscores that the conduct engaged in by the defendant

> officers here was a direct result of the culture endemic to the SFPD during the relevant time period. This culture, as evidenced by the SFPD's demonstrated failure to curb or discipline unlawful conduct such as that repeatedly displayed by defendant Crenshaw during his tenure as a SFPD officer, including as it directly impacted plaintiff, amounted to a ratification by the SFPD of such conduct by defendant Crenshaw and other officers of the SFPD.

SAC ¶ 101 (emphasis added). Other than an allegation identifying Caldwell as an African American man, this is the sole reference to race in the SAC. *See* SAC ¶ 16. The SAC contains no references to racial discrimination or "systemic racism."[5]

Caldwell may not rely on theories of *Monell* liability based on allegations of "systemic racism" because they were not pleaded in the SAC. The allegations in paragraph 101 do not fairly put Defendants on notice that Caldwell was pursing such theories, particularly since they do not mention "systemic racism" or even racial discrimination. Without more, the allegation of "scores of unlawful arrests and wrongful convictions, particularly among racial minorities" is insufficient to plead *Monell* theories based on an alleged "practice of not disciplining SFPD officers so they believed they could violate the rights of people of color" and "fail[ure] to train officers to respect the civil rights of persons of color in the City's housing projects." *See, e.g., Pickern v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (holding that plaintiff failed to provide defendants with adequate notice of allegations raised for the first time in response to motion for summary judgment; plaintiff's complaint failed to "give the defendant fair notice of what the plaintiff's claim [was] and the grounds upon which [it] rest[ed]," as required by Federal Rule of Civil Procedure Rule 8(a)(2)).

The record demonstrates that Caldwell's "systemic racism" theory is of recent formulation. In opposition to Defendants' 2015 motion for summary judgment, Caldwell did not argue that his *Monell* claim was based on a theory of systemic racism within the SFPD. Instead, he argued that the SFPD's complaint and discipline system was so ineffective that "officers knew they would not

---

[5] Caldwell also cites paragraphs 165 and 181, but those paragraphs do not add any substantive assertions and merely loop back to the allegations in paragraph 101. Thus, Paragraph 165 incorporates by reference earlier paragraphs, including paragraph 101, and paragraph 181 repeats the allegation from paragraph 101 that the SFPD "had a custom and practice of failing to adequately investigate and act upon complaints about officer conduct . . . thereby encouraging officers to engage in such conduct with impunity . . ." Opp'n 19 n.10.

be accountable for misconduct, and therefore believed they could act with impunity," and that this failure "played a part in the violation of federal law by Crenshaw." [*See* Docket No. 292 at 49-51.]

At the hearing, the court ordered plaintiff's counsel to definitively articulate Caldwell's theories of *Monell* liability. Counsel articulated two theories, both of which are adequately set forth in the operative complaint: 1) that San Francisco had a custom and practice of failing to adequately investigate and act on citizen complaints against SFPD officers which encouraged officers to believe that they could act with impunity in ways such as fabricating evidence and retaliating against citizens; and 2) that SFPD Police Chief Casey ratified Crenshaw's violation of Caldwell's civil rights. These are the only theories of *Monell* liability on which Caldwell may proceed.

## IV.    LEGAL STANDARDS

### A.  Summary Judgment

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a

1  scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252;

2  conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738

3  (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is

4  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

5  adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

6      **B.**   *Monell* **Liability**

7      A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of

8  rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S.

9  51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). However, the municipality may be held liable

10  "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

11  It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish

12  municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused

13  their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement was

14  intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

15  thereby make clear that municipal liability is limited to action for which the municipality is

16  actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal

17  policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials,

18  and practices so persistent and widespread as to practically have the force of law." *Connick*, 563

19  U.S. at 61 (citations omitted). Such policy or practice must be a "moving force behind a violation

20  of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

21  *Monell*, 436 U.S. at 694). An official municipal policy may be either formal or informal. *City of

22  Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show

23  that "a municipality's actual policies were different from the ones that had been announced.").

24      In the Ninth Circuit, a municipality may be liable under section 1983 under three possible

25  theories. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018). The first is where

26  "execution of a government's policy or custom, whether made by its lawmakers or by those whose

27  edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Id.* (quoting

28  *Monell*, 436 U.S. at 694). "A policy or custom may be found either in an affirmative proclamation

United States District Court
Northern District of California

of policy or in the failure of an official 'to take any remedial steps after [constitutional] violations.'" *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (holding that a jury could find a policy or custom of using excessive force from the police chief's failure to discipline officers for such conduct)); *see also Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234-35 (9th Cir. 2011) (holding that "evidence of a recurring failure to investigate and discipline municipal officers for constitutional violations can help establish the existence of an unconstitutional practice or custom" of using excessive force).

Second, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Finally, a municipality may be liable under section 1983 if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez*, 891 F.3d at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks and citation omitted)).

## V.     DISCUSSION

### A. Plaintiff's First *Monell* Theory: A Custom and Practice of Failing to Adequately Investigate and Act on Citizen Complaints Against SFPD Officers

#### 1. Whether Deliberate Indifference is an Element of Caldwell's First *Monell* Theory

Caldwell's first theory of *Monell* liability is that San Francisco had an unlawful custom or practice of failing to adequately investigate and act on citizen complaints against SFPD officers which encouraged officers to believe that they could act with impunity, and that this custom or practice caused his injury. As the parties did not adequately address the governing legal standard, the court ordered them to submit supplemental briefing on whether Caldwell's theory alleges an official municipal policy, practice, or custom (first method of proving *Monell* liability), or whether

United States District Court
Northern District of California

1    it alleges deliberate indifference by the municipality (second method of proving *Monell* liability).

2    The parties specifically were instructed to include a discussion of recent Ninth Circuit authority as

3    well as Ninth Circuit model jury instructions 9.5 and 9.8 and commentary thereto.  [*See* Docket

4    No. 465 (Minute Order).]  The parties timely filed the requested briefing.  [Docket Nos. 467 (Pl.'s

5    Supp. Br.), 471 (Defs.' Supp. Br.).]

6        As discussed below, the key legal question is whether Caldwell asserts that San Francisco

7    had an unconstitutional policy of action, or whether he asserts the existence of a policy of inaction.

8    The latter requires a showing of deliberate indifference.  Caldwell argues that he does not have to

9    establish deliberate indifference, while Defendants argue the opposite.

10       In order to prove a claim for municipal liability under *Monell*, a plaintiff must

11   "demonstrate that an 'official policy, custom, or pattern' on the part of [the defendant] was 'the

12   actionable cause of the claimed injury.'"  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th

13   Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)).

14   The Ninth Circuit recognizes that municipalities can be held liable under *Monell* for policies of

15   inaction or omission as well as policies of action or commission.  *Jackson v. Barnes*, 749 F.3d

16   755, 763 (9th Cir. 2014) (citing *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir.

17   2002), *overruled on other grounds in Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th

18   Cir. 2016)).  "A policy of action is one in which the government body itself violates someone's

19   constitutional rights, or instructs its employees to do so; a policy of inaction is based on a

20   government body's 'failure to implement procedural safeguards to prevent constitutional

21   violations.'"  *Jackson*, 749 F.3d at 763 (quoting *Tsao*, 698 F.3d at 1143).  In cases alleging a

22   policy of inaction, a municipality may be responsible through its omissions "for a constitutional

23   violation committed by one of its employees, even though the municipality's policies were facially

24   constitutional, the municipality did not direct the employee to take the unconstitutional action, and

25   the municipality did not have the state of mind required to prove the underlying violation."

26   *Gibson*, 290 F.3d at 1185-86.  In such cases, the plaintiff must establish that the policy "amounts

27   to deliberate indifference to the plaintiff's constitutional right," which requires showing that the

28   government body "was on actual or constructive notice that its omission would likely result in a

United States District Court
Northern District of California

constitutional violation." *Tsao*, 698 F.3d at 1143, 1145 (citations and quotation marks omitted).

A plaintiff can "establish the existence of an unconstitutional practice or custom," such as "an informal but widespread custom of using excessive force," through "evidence of a recurring failure to investigate and discipline officers for" such violations. *Hunter*, 652 F.3d at 1234-35.  In such cases, "evidence of inaction" by the municipality "can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality," despite an official policy prohibiting the unconstitutional act. *Id*. at 1234 n.8.  In other words, evidence of inaction—e.g., failure to discipline—can support the existence of an unconstitutional policy of action—e.g., excessive use of force.  This is consistent with the Ninth Circuit's Model Jury Instruction No. 9.5, which sets forth the elements of a *Monell* claim based on an "official policy, practice or custom," and provides that "[a] practice or custom can be established by repeated constitutional violations that were not properly investigated and for which the violator[s] [was] [were] not disciplined, reprimanded or punished." *See, e.g., Larez*, 946 F.2d at 647 (holding that a jury could find "a departmental policy or custom of resorting to the use of excessive force . . . from the failure of [the police chief] to take any remedial steps after the violations.").

In contrast, "[a] policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143; *see also Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992) (holding that a government entity "may be held liable for failing to act to preserve a constitutional right" under a deliberate indifference theory).  The Ninth Circuit has held that "a § 1983 plaintiff may prove the second type of *Monell* liability, deliberate indifference, through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'" *Rodriguez*, 891 F.3d at 802-03 (quoting *Hunter*, 652 F.3d at 1234 n.8 ("We have also recognized that in some circumstances a *policy* of inaction, such as a policy of failing to properly train employees, may form the basis for municipal liability." (emphasis in original)).

In his supplemental brief, Caldwell states that his first *Monell* theory alleges a policy of action, but he offers no analysis of the factual particulars and fails to grapple with the cases distinguishing between policies of action and inaction.  Pl.'s Supp. Br. 1.  The court finds that

United States District Court
Northern District of California

Caldwell's *Monell* claim alleges a policy of inaction.  He contends that San Francisco's failure to adequately investigate and act on citizen complaints encouraged officers to believe that they could act with impunity, which caused his injury.  Put another way, Caldwell alleges that San Francisco had a policy, custom, or practice of being deliberately indifferent to SFPD officers' misconduct through a faulty and anemic OCC citizen complaint system.  *See, e.g., Hayes v. Riley*, No. 20-CV-04283-VC, 2020 WL 5816581, at *2 (N.D. Cal. Sept. 30, 2020) (discussing failure-to-discipline *Monell* claim and noting that "[i]f the same officer repeatedly violates the constitutional rights of a city's residents, and the city is on notice of these violations and fails to properly discipline the officer, by definition the city is deliberately indifferent to the likelihood that the officer will continue to commit constitutional violations in the future").  This reading of Caldwell's claim is consistent with the Ninth Circuit's Model Jury Instruction 9.8, which addresses "Section 1983 Claim[s] Against Local Governing Body Defendants Based on Policy that Fails to Prevent Violations of Law or a Policy of Failure to Train."  That instruction requires a plaintiff to prove, among other things, that "the defendant was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees."  The court concludes that deliberate indifference is a required element of Caldwell's claim.

### 2.   Analysis

Having determined the applicable legal standard, the court now examines whether Caldwell's first theory of *Monell* liability survives summary judgment.  In support of this claim, Caldwell submits a declaration by police practices expert Russell Fischer, who opines that in 1990, the SFPD's complaint investigation and disciplinary system for police officers was inconsistent with generally accepted police policies and practices; was not effective and imposed only limited discipline; and "encouraged SFPD officers to believe they could act with impunity and engage in constitutional violations with no fear of being disciplined."  Fischer Decl. ¶ 8(a). According to Fischer, if the SFPD had a disciplinary system in 1990 that was consistent with generally accepted policies and practices, "Crenshaw would not have believed he could act with impunity and the cold show at Mary Cobbs' apartment and the potentially fabricated police report might not have occurred[.]"  *Id.* at ¶¶ 8(a), 118.

24

United States District Court
Northern District of California

Fischer's opinions are based in part on his analysis of 66 OCC complaints filed against Crenshaw and the OCC investigative files for six of those complaints. *Id*. at ¶ 72. According to Fischer, these records "demonstrate[ ] significant failures of the SFPD internal discipline system." *Id*. Fischer states that the files in this sample reveal that as of June 1990, "there was an investigative methodology that varies from case to case, significant documentation irregularities, [and] a repeated failure to interview witnesses," which shows that the OCC's investigations were "inconsistent with minimal generally accepted police customs and practices for internal complaint and discipline systems." While acknowledging the small sample size of the OCC investigative files, Fischer notes that every one of the six files "shows the same inadequacies with the OCC investigative process," and states that "the information from these six reports can reasonably be assumed to apply in general to OCC investigations and the police discipline system in 1990." *Id*. at ¶¶ 80-81; *see also id*. at ¶¶ 82-85 (detailing alleged shortcomings in investigations). According to Fischer, the OCC investigative files demonstrate that "the internal investigation and disciplinary functions based on investigations of citizen complaints [were] virtually meaningless . . . as of 1990." *Id*. at ¶ 86.

Fischer also addresses the number, substance, and outcome of OCC complaints filed against Crenshaw. He states that from 1987-1989, a total of 25 OCC complaints were filed against Crenshaw and none were sustained. Crenshaw did not recall ever being referred to any internal SFPD departments or receiving counseling related to the number of complaints filed against him. He admitted that he was issued written reprimands in 1980 and 2003, but that no other discipline had been imposed on him. *Id*. at ¶¶ 74, 75.

With respect to the high number of OCC complaints filed against Crenshaw, Fischer states that "[u]nder any effective early warning system, the system should have alerted to the large number of citizen complaints that were filed against Crenshaw, and triggered counseling and other observation." *Id*. at ¶ 78. According to Fischer, "an early warning system is a data-based police management process to identify officers whose behavior may be problematic and to provide a form of intervention to correct that behavior." *Id*. at ¶ 91. He states that ten complaints in one year "is significant enough to have required further review," and more than 60 such complaints

25

against one officer "clearly required, under generally accepted police practices in the 1990s, that supervisors intervene to determine the cause." *Id*. at ¶ 78. In Fischer's opinion, given the frequency of complaints against Crenshaw, his supervisors should have "closely monitored" his actions and behavior in the late 1980s, and he should have been "singled out for extra review and counselling." *Id*. He also states his opinion that had there been an effective early warning system in place by 1990, "one or more of the citizen complaints against Crenshaw could have been mitigated and employee interventions initiated." *Id*.

As to the specific conduct at issue in this case, Fischer states that Caldwell asserts in his lawsuit that Crenshaw improperly targeted Caldwell for Acosta's murder, and that Crenshaw had animus toward Caldwell, regularly harassed him for no reason, had threatened to kill Caldwell, and had been the subject of an OCC complaint by Caldwell. Fischer states that for the years prior to 1990, there were 13 OCC complaints against Crenshaw involving similar conduct as that alleged in this case; that is, four complaints alleging retaliation or threats of violence, one for fabrication of evidence, seven for excessive force and/or violence, and one for abusive behavior. Fischer states that the conduct raised in these OCC complaints is "similar to the type of conduct that [Caldwell] alleges Crenshaw engaged in that targeted [Caldwell] as being involved in the Acosta murder." *Id*. at ¶¶ 76-77.

Fischer also addresses the rate at which SFPD officers were disciplined as a result of OCC investigations, based on the OCC annual reports for the years 1985 through 1992. He states that the "limited statistics provided in those reports does not demonstrate an effective discipline system," challenging the sufficiency of the data in the reports. *Id*. at ¶ 109. For example, for the years 1985 and 1987, the OCC reports state the number of complaints filed but do not provide data about the number of cases sustained. *Id*. at ¶ 109(a). The report covering 1986 provides the number of cases sustained (19 cases out of 1,267) but does not set forth information about discipline. *Id*. at ¶ 109(b). For the years 1988-1990, the OCC reports provide information about the number of cases sustained and discipline imposed by the SFPD, but the percentages of cases resulting in discipline for those years range from less than 1% to 1.7% of the total number of OCC cases. *Id*. at ¶¶ 109(c)-(e). According to Fischer, these statistics "show a discipline system that is

not effective." *Id.* at ¶ 110.

Caldwell argues that this evidence, taken together, shows that San Francisco's disciplinary system for SFPD officers was ineffective and inadequate, and that the deficient system was a moving force in the violation of his constitutional rights because it led Crenshaw to believe that he could act with impunity and violate Caldwell's constitutional rights.

Defendants offer two main arguments in response.  First, they argue that there is no evidence in the OCC complaints of a pattern of misconduct related to the particular constitutional violations alleged in this case, that is, improper show-ups and fabricated evidence.  According to Defendants, Fischer's declaration does not connect any purported lack of discipline with these specific constitutional violations.  This is a misreading of Caldwell's theory, which is that the investigation and disciplinary system as a whole was so ineffectual that it emboldened SFPD officers to commit constitutional violations because they believed that they would not face discipline for such abuses.  A reasonable jury could rely on the low rates of OCC complaints resulting in discipline during the three years before Caldwell's conviction, along with Fischer's testimony that deficiencies in the OCC's investigative process rendered investigations "virtually meaningless," and find that "officers understood that if their conduct violated citizens' rights, it would nevertheless go unpunished, if not expressly condoned."  *See Lisker v. City of Los Angeles*, No. CV09-09374 AHM (AJWx), 2013 WL 1276047, at *32-33 (C.D. Cal. Feb. 4, 2013); *see also Larez*, 946 F.2d at 647 (holding that jury could find that evidence that it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen" supported the plaintiffs' theory that police department's "disciplinary and complaint processes . . . contributed to the police excesses complained of because the procedures made clear to officers that, at least in the absence of independent, third party witnesses, they could get away with anything.").  A jury could also find that evidence of the high number of OCC complaints filed against Crenshaw in the three years before Caldwell's arrest (25 total), including complaints alleging the same or similar abuses at issue in this case, none of which resulted in discipline, further supports Caldwell's theory that SFPD officers, including Crenshaw, believed there would be no repercussions for misconduct.

United States District Court
Northern District of California

1    Defendants also contend that the OCC reports contradict Caldwell's claim that San

2    Francisco failed to investigate complaints against SFPD officers.  They argue that the reports

3    actually show that complaints were investigated and that the OCC sustained some, albeit at low

4    rates.  This too misreads Fischer's testimony, which is not that the OCC rarely or never

5    investigated complaints against officers.  Instead, he opines that the investigation and discipline

6    system was not effective due to "inadequacies in the investigative methodology, interviews,

7    conclusions and supporting documentation."  Fischer Decl. ¶¶ 84-86.  Fischer details these

8    inadequacies, including OCC determinations "made without contacting witnesses [and] by

9    crediting police officer statements over the statements of the complainants without documenting

10   the basis for such credibility determinations," and the OCC's overall failure to "utilize proper and

11   consistent investigative methodologies that comport with generally accepted police practices and

12   procedures as of 1990."  *Id.* at ¶ 86.

13   In sum, the court concludes that on the current record, a reasonable jury could find that at

14   the time of the events at issue in this case, San Francisco had a custom or practice of failing to

15   adequately investigate and act on citizen complaints against SFPD officers, including complaints

16   about retaliation, intimidation, and fabrication of evidence, and that this custom or practice

17   encouraged SFPD officers, including Crenshaw, to believe that they could act with impunity

18   towards citizens.  *See, e.g., Lisker*, 2013 WL 1276047, at *32-33 (holding that plaintiff had

19   presented sufficient evidence to raise a dispute of fact "as to whether the LAPD maintained a

20   custom or policy of failing to discipline officers for misconduct, such that [defendant officers] felt

21   free to falsify evidence during [the plaintiff's] murder investigation, knowing that their conduct

22   would not be thoroughly investigated and they would not be disciplined.").

23   Caldwell must also demonstrate a genuine issue of material fact as to whether the policy or

24   custom "reflects deliberate indifference to the constitutional rights of its inhabitants."  *City of*

25   *Canton*, 489 U.S. at 392.  "This occurs when the need for more or different action 'is so obvious,

26   and the inadequacy [of the current procedure] so likely to result in the violation of constitutional

27   rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the

28   need.'"  *Oviatt*, 954 F.2d at 1477-78 (quoting *City of Canton*, 489 U.S. at 390).  "Whether a local

government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Id*.

The court concludes that Caldwell has established a triable issue of fact regarding whether San Francisco acted with deliberate indifference. For example, a reasonable jury could consider the evidence described above and conclude that there was an obvious need for San Francisco to take different action to protect the constitutional rights of its citizens. This evidence includes the significant number of citizen complaints against Crenshaw in the three-year period before Caldwell's arrest, including complaints about retaliation and threats of violence, fabrication of evidence, excessive force, and abusive behavior, none of which were sustained or resulted in any discipline. According to Fischer, the number of complaints against Crenshaw should have resulted in "further review including intervention or counseling," but there is no evidence that there was "any supervisory review of Crenshaw concerning the number of citizen complaints against him" or monitoring by any supervisors. *See* Fischer Decl. ¶ 78. *See Velazquez*, 793 F.3d at 1028 (holding that evidence of ten citizen complaints regarding officer's conduct, three of which involved excessive force, as well as "over 30 internal affairs incidents of force" in a two-year period, was "relevant, indeed critical, to prove that the City was aware of [officer's] alleged tendency to use excessive force" for purposes of failure-to-discipline *Monell* theory). Additionally, Fischer states that the OCC annual reports during the years preceding Caldwell's arrest "provide very little" or "ambiguous" data which make it "difficult . . . to fully understand statistically what has occurred," which a reasonable jury could conclude supports the conclusion that San Francisco was deliberately indifferent to the rights of its inhabitants. *See* Fischer Decl. ¶ 109.

For the foregoing reasons, summary judgment is denied as to Caldwell's first theory of *Monell* liability.

### B.    Plaintiff's Second *Monell* Theory: Ratification

Caldwell also argues that triable issues of fact preclude summary judgment on his ratification theory of *Monell* liability, which is based on the following facts. Chief Casey held a Chief's Disciplinary Hearing on September 12, 1991, (after Caldwell's conviction), regarding the

1    OCC's finding that Crenshaw threatened to kill Caldwell at a police station. At the hearing, Chief

2    Casey learned from Gerrans that Crenshaw had been involved in the Acosta murder investigation.

3    According to Caldwell, Crenshaw engaged in unconstitutional behavior by "injecting himself into

4    [the] investigation when that violated all generally-accepted police practices" due to the existence

5    of a pending OCC complaint by Caldwell against Crenshaw. Caldwell asserts that Chief Casey

6    ratified Crenshaw's unconstitutional behavior by learning about it in the hearing and failing to

7    discipline him for it. [Docket No. 469 (Hr'g Tr., Oct. 1, 2020) 9-13.]

8         In support, Caldwell cites deposition testimony that Gerrans agreed to "testify in a chief's

9    hearing" on behalf of Crenshaw regarding Caldwell's complaint. Gerrans testified that at the

10   hearing, he "might have mentioned that [Crenshaw] helped us some in [the Acosta] case."

11   [Docket No. 425-10 (Gerrans Dep., May 27, 2015) 158-59.]

12        A municipality may be liable under section 1983 if "an official with final policy-making

13   authority . . . ratified a subordinate's unconstitutional decision or action and the basis for it."

14   *Rodriguez*, 891 F.3d at 802-03 (quotation marks and citation omitted). "To show ratification, a

15   plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the

16   basis for it,'" which accordingly requires, "among other things, knowledge of the alleged

17   constitutional violation." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St.*

18   *Louis v. Paprotnik*, 485 U.S. 112, 127 (1988)). Here, Caldwell offers no evidence that Chief

19   Casey or any other policy maker was aware of the allegedly unconstitutional conduct that remains

20   at issue in this case, that is, the allegations that Crenshaw manufactured the unduly suggestive

21   show-up and fabricated a statement by Caldwell. Gerrans's testimony that he "might have

22   mentioned" at the Chief's Disciplinary Hearing that Crenshaw "helped . . . some" in the Acosta

23   murder investigation is insufficient to create a dispute of fact regarding whether Chief Casey knew

24   about the alleged show-up and/or the fabricated statement and thus approved this conduct by not

25   deciding not to discipline Crenshaw. Accordingly, Caldwell has failed to show a genuine issue of

26   material fact that Chief Casey ratified Caldwell's actions. Summary judgment is therefore granted

27   as to this theory of *Monell* liability.

28

United States District Court
Northern District of California

## VI.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: December 23, 2020



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California