UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE CALDWELL,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN FRANCISCO, et al.,<br><br>Defendants. | Case No. 12-cv-01892-DMR<br><br>**ORDER DENYING MOTION TO DISQUALIFY COUNSEL**<br><br>Re: Dkt. No. 489 |

Defendants Kitt Crenshaw and City and County of San Francisco ("San Francisco") filed a motion to disqualify Plaintiff Maurice Caldwell's counsel James Quadra. [Docket No. 489.] This matter is appropriate for decision without a hearing. Civ. L.R. 7-1(b). For the following reasons, the motion is denied.

## I.   FACTUAL BACKGROUND

### A.   The *Tennison* and *Goff* Cases[1]

In 2004, the San Francisco City Attorney ("City Attorney") hired Quadra to represent former San Francisco police chief Earl Sanders and former police homicide inspector Napoleon Hendrix in *Tennison v. City & County of San Francisco*, No. 04-cv-00574-CW (N.D. Cal., filed Feb. 11, 2004), and a related case, *Goff v. City & County of San Francisco*, No. 04-cv-01643-CW (N.D. Cal., filed Apr. 27, 2004).[2] *Id*. at ¶ 2; *see also* Docket No. 489-1 (Ackiron Decl., Nov. 16,

---

[1] The facts of this case are discussed in detail in the Honorable Elizabeth D. Laporte's March 2, 2016 Order Granting Defendants' Motion for Summary Judgment (Docket No. 373), the Ninth Circuit's opinion *Caldwell v. City & County of San Francisco*, 889 F.3d 1105 (9th Cir. 2018), and the undersigned's December 23, 2020 Order on Defendants' Motion for Summary Judgment on Plaintiff's *Monell* Claim (Docket No. 507 (Order on MSJ)). The court does not repeat them here.

[2] The cases were consolidated for all proceedings. *See Tennison v. City & Cnty. of San Francisco*, No. C 04-0574 CW, C 04-1643 CW, 2006 WL 733470, at *1, 17 (N.D. Cal. Mar. 22, 2006); *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1081, 1086 (9th Cir. 2009).

2020) ¶¶ 2, 3. John Tennison and Antoine Goff served nearly 13 years in prison for a murder committed in 1989. After a court granted Tennison's petition for writ of habeas corpus, Tennison and Goff were both released from custody and subsequently were declared to be factually innocent of the crime. Tennison and Goff each filed a 42 U.S.C. § 1983 action against Sanders and Hendrix, the inspectors who investigated the murder. Their lawsuits alleged that Sanders and Hendrix withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and also pressured a witness to retract her recantation of a previous statement that she had been an eyewitness to the murder. Tennison and Goff's lawsuits named two other defendants: George Butterworth, the assistant district attorney who prosecuted the plaintiffs, and San Francisco.

The City Attorney represented San Francisco and Butterworth. Quadra was hired to represent Sanders and Hendrix due to the existence of ethical conflicts. The City Attorney could not represent Sanders because he had a pending lawsuit against San Francisco on an unrelated matter. Quadra Decl. ¶ 3; Ackiron Decl. ¶ 3. Quadra describes four additional conflicts that prevented the City Attorney from representing Sanders and Hendrix. First, a conflict existed among the individual defendants because Butterworth was pointing the finger at Sanders and Hendrix by claiming that they were responsible for any *Brady* violations, while Sanders and Hendrix took the opposite position and asserted that Butterworth was responsible for any failure to turn over exculpatory evidence. Quadra Decl. ¶¶ 4, 6. Second, the plaintiffs sought punitive damages against Sanders and Hendrix, and "the City made clear it was not required to pay for punitive damages if awarded" against them. *Id*. at ¶ 6. Third, before Tennison and Goff filed their lawsuits, San Francisco stipulated to their factual innocence and agreed pursuant to California Penal Code section 851.8 that "no reasonable cause existed to believe that Tennison or Goff had committed" the murder of Shannon. However, Sanders and Hendrix argued in the litigation that reasonable cause did exist. *Id*. at ¶ 4. Finally, San Francisco took the position that it was not subject to municipal liability because the inspectors "were trained to turn over all information to the District Attorney's office." However, Sanders and Hendrix contradicted San Francisco's

position by arguing that they satisfied their *Brady* obligations "by placing information in the police file and making the file available" to prosecutors. *Id.* at ¶ 7.

The City Attorney retained Quadra as conflict counsel for Sanders and Hendrix in 2004. [Docket No. 489-2 (Osborn Decl., Nov. 19, 2020) ¶¶ 8-10, Exs. B, C, D (correspondence and Hendrix representation agreement).] His representation lasted until 2009 when the cases resolved pursuant to a stipulated consent judgment. Quadra Decl. ¶¶ 2, 11.

San Francisco submits a declaration by former Deputy City Attorney Evan Ackiron, who worked in the City Attorney's office until 2006. Ackiron Decl. ¶ 2. Ackiron states that from approximately 2004 through 2006, he represented San Francisco and Butterworth in the *Tennison* and *Goff* cases. He avers that the legal interests of Quadra's clients "were aligned with the interests of [San Francisco] in those cases" because San Francisco had agreed to indemnify Sanders and Hendrix, and because Sanders and Hendrix "asserted no separate liability defenses that created any adversarial relationship" between them and San Francisco. *Id.* at ¶ 4. Ackiron states that he and other Deputy City Attorneys "worked intimately with Mr. Quadra to defend the Tennison and Goff cases," including "providing Mr. Quadra full access to City documents and personnel, as well as providing him confidential information and developing with him a mutual litigation strategy." *Id.*

Although Defendants do not contend that a written common interest agreement existed between Sanders, Hendrix, San Francisco, and Butterworth, *see* Mot. 5, Ackiron states that "the defense of the case was handled jointly . . . among defense counsel." Ackiron Decl. ¶ 5. He also asserts that Quadra along with Deputy City Attorneys "discussed litigation strategy and engaged in privileged attorney client communications to jointly defend" the case. *Id.* Ackiron does not provide any details of the relationship between Quadra and the City Attorney's office nor does he describe the confidential and privileged information purportedly shared with Quadra.

**B.  Quadra's Representation of Caldwell**

Quadra filed a notice of appearance as an attorney for Caldwell on October 29, 2019. [*See* Docket No. 403.]

On June 30, 2020, Caldwell filed his opposition to San Francisco's motion for summary

judgment on his *Monell* claim. [Docket No. 438.] In support of his opposition, he filed the expert declaration of Professor Halford Fairchild. [Docket No. 445 (Fairchild Decl., June 30, 2020).] In one paragraph of a 48-page, 100-paragraph declaration, Fairchild references the exonerations of Tennison and Goff as examples of his opinion that the criminal justice system was heavily weighted against Black men in San Francisco in 1990. *Id*. at ¶ 60. On September 29, 2020, Caldwell served Fairchild's expert report, which contains the same language relating to exonerations of Tennison and Goff. [Docket No. 500-7 (Gross Decl., Dec. 2, 2020) ¶ 5, Ex. A ¶ 83.] In a subsequent declaration, Fairchild states that he has never met Quadra or received any information from him in connection with this case. [Docket No. 500-5 (Fairchild Decl., Dec. 1, 2020) ¶ 3.] He has never discussed the *Tennison* and *Goff* cases with Quadra. *Id*. Fairchild states that he obtained all of the information set forth in his expert declarations about Tennison and Goff from publicly-available materials that he identifies in his declaration. *Id*. at ¶ 4.[3]

### C. Defendants' Motion to Disqualify

On November 19, 2020, nearly five months after Caldwell filed Fairchild's declaration referencing the *Tennison* and *Goff* cases, Defendants filed the present motion to disqualify Quadra on the ground that his representation of Sanders and Hendrix in those cases constitutes a conflict of interest with his representation of Caldwell in this case. They also filed an administrative motion for an order shortening time on the motion to disqualify, which Caldwell opposed. The court denied the administrative motion on November 25, 2020. [Docket Nos. 491, 496, 498.]

Caldwell opposes the motion to disqualify. [Docket No. 500.]

## II. LEGAL STANDARD

"The Court has the primary responsibility for overseeing the conduct of the attorneys who appear before it." *San Gabriel Basin Water Quality Auth. v. Aerojet-Gen. Corp.*, 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000) (citing *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980)). Attorneys

---

[3] In its December 23, 2020 Order, the court noted that "Caldwell offer[ed] Fairchild's declaration in support of a theory of *Monell* liability centered on the existence of systemic racism in the SFPD" and held that such a theory had not been pleaded in the operative complaint. Accordingly, the court declined to consider Fairchild's opinions for the purpose of deciding that motion. Order on MSJ 14.

4

practicing in this district are required to comply with the California Rules of Professional Conduct. *See* Civ. L.R. 11–4(a)(1) (all attorneys practicing before the court must "[b]e familiar and comply with the standards of professional conduct required of members of the State Bar of California"). In order to determine whether to disqualify counsel, the court applies California law. *In re Cty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Hitachi, Ltd. v. Tatung Co.,* 419 F. Supp. 2d 1158, 1160 (N.D. Cal. 2006).

"A court should examine a motion to disqualify counsel carefully 'to ensure that literalism does not deny the parties substantial justice.'" *Gotham City Online, LLC v. Art.com, Inc.*, No. C 14-00991 JSW, 2014 WL 1025120, at *2 (N.D. Cal. Mar. 13, 2014) (citing *People ex rel Dep't of Corps. v. Speedee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1144 (1999)). Thus, a court must balance such varied interests as a party's right to chosen counsel, the interest in representing a client, the burden placed on a client to find new counsel, and the possibility that "tactical abuse underlies the disqualification motion." *Id.* (citing *Speedee Oil*, 20 Cal. 4th at 1145). "An order of disqualification of counsel is a drastic measure, which courts should hesitate to impose except in circumstances of absolute necessity." *In re Marvel*, 251 B.R. 869, 871 (N.D. Cal. 2000) (citing *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir. 1983)). The moving party, therefore, carries a heavy burden and must satisfy a high standard of proof. *Gotham City*, 2014 WL 1025120 at *3 ("Motions for disqualification are often tactically motivated and they tend to derail the efficient progress of litigation.") (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)). "To be justified, a motion to disqualify must be based on present concerns and not concerns which are merely anticipatory and speculative." *In re Marvel*, 251 B.R. at 871 (citing *In re Coordinated Pretrial Proceedings*, 658 F.2d 1355, 1361 (9th Cir. 1981)); *DCH Health Servs. Corp. v. Waite*, 95 Cal. App. 4th 829, 833 (2002) (speculative contentions are insufficient to justify disqualification of counsel). "Because of the potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny." *Gotham City*, 2014 WL 1025120 at *3 (citing *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.,* 760 F.2d 1045, 1049 (9th Cir. 1985)). Whether to disqualify counsel for a conflict of interest is within the trial court's discretion. *Hitachi*, 419 F. Supp. 2d at 1160 (citing *Trone*, 621 F.2d at 999).

### III.   DISCUSSION

Defendants move to disqualify Quadra based on an alleged conflict of interest created by his prior representation of Sanders and Hendrix. They contend that Caldwell relies on "evidence of the alleged wrongdoing of Mr. Quadra's former clients" to support his claims, and that because his "theory of causation relies at least in part on the cases of *Tennison* and *Goff*," Quadra's prior representation gives rise to a conflict warranting disqualification. Mot. 4.

Unfortunately, Defendants have hampered the court's review of their motion by failing to identify the California Rule of Professional Conduct they claim Quadra violated. They also do not set forth a clear statement of the standards governing their motion. Instead, they base their analysis primarily on *Diva Limousine, Ltd. v. Uber Technologies, Inc.*, No. 18-cv-05546-EMC, 2019 WL 144589 (N.D. Cal. Jan. 9, 2019), but that case analyzed disqualification under California Rule of Professional Conduct 3-310(E)[4], which was no longer effective after October 31, 2018 and thus does not apply to Quadra's representation of Caldwell, which began in 2019. *See Marshall v. Northrop Grumman Corp.*, No. 216CV06794ABJCX, 2019 WL 4143300, at *4 (C.D. Cal. July 23, 2019) (analyzing disqualification motion under rule in effect on the date of retention). Successive representation is now generally governed by California Rule of Professional Conduct 1.9, "Duties to Former Clients," which states:

> **(a)** A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent.
>
> **(b)** A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
>> (1) whose interests are materially adverse to that person; and
>>
>> (2) about whom the lawyer had acquired information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter;

---

[4] Rule 3-310(E) stated, "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

6

>unless the former client gives informed written consent.
>
>**(c)** A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
>>(1) use information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 acquired by virtue of the representation of the former client to the disadvantage of the former client except as these rules or the State Bar Act would permit with respect to a current client, or when the information has become generally known; or
>>
>>(2) reveal information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 acquired by virtue of the representation of the former client except as these rules or the State Bar Act permit with respect to a current client.

Cal. Rule of Professional Conduct 1.9.

Defendants do not cite Rule 1.9, much less explain which subsection they contend applies here. It is not the court's job to find their arguments for them. Defendants' failure to identify or address the applicable California Rule of Professional Conduct alone is fatal to their motion.

Even if the court were to overlook this fundamental flaw, Defendants fall far short of meeting their heavy burden to show that disqualification is warranted. "It is well-established that an attorney, after severing his or her relationship with a client, 'may not do anything which will injuriously affect his former client in any matter in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.'" *O'Gara Coach Co., LLC v. Ra*, 30 Cal. App. 5th 1115, 1124 (2019) (citation omitted). This prohibition "is grounded" in both prior Rule 3-310(E) and current Rule 1.9. *Id.* The disqualification standards applicable to successive representation cases "focus on the former client's interest 'in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation.'" *Id.* at 1125 (citations omitted). "Disqualification is required if the current representation involves the legal services performed by the attorney for the former client … or, even if not the same matter, if a substantial relationship exists between the former representation and the current representation. *Id.*, (citations omitted).

Quadra's current representation does not involve "the legal services performed by the

7

attorney for the former client." Therefore, the court must examine whether a "substantial relationship" exists between Quadra's former and current representation. *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 705 (2003). "The 'substantial relationship' test examines 'the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases.'" *Diva*, 2019 WL 144589, at *5 (quoting *Acacia Patent Acquisition, LLC v. Superior Court*, 234 Cal. App. 4th 1091, 1097-98 (2015)).

Defendants have not established a substantial relationship between the work Quadra performed on behalf of Sanders and Hendrix, and the work he now performs as Caldwell's attorney. To begin with, Defendants have not established that Quadra obtained confidential information during his former representation that somehow bears on this case. Defendants admit that there was no written common interest agreement between San Francisco, Sanders, and Hendrix during the *Tennison* and *Goff* cases, but argue that a common interest or joint defense agreement "may be implied from conduct and situation," including "attorneys exchanging confidential communications from clients who . . . have common interests in litigation." Defs.' Mot. 5 (citing *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012)). The common interest doctrine, also known as the joint defense doctrine, is not a privilege itself; rather, it "constitutes [an] exception[ ] to the rule on waiver [of the attorney client privilege] where communications are disclosed to third parties." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). "[S]ince it is an anti-waiver exception, it comes into play only if the communication at issue is privileged in the first instance." *Id*.

Under the foregoing authority, Defendants must first establish that any communications to which Quadra was a party were protected by the attorney-client privilege. Then, Defendants must demonstrate that sharing the communications with Quadra, a third party, did not result in waiver due to the existence of an implied common interest agreement. *See Diva*, 2019 WL 144589, at *6 (discussing burden). Defendants do not address the standard for the attorney-client privilege at all and provide only a cursory analysis of the common interest doctrine. *See* Defs.' Mot. 5-6. Instead, they rely on Ackiron's broad statements that Quadra "was freely granted access by the

8

City Attorney's Office to all documents and information" in San Francisco's possession during the *Tennison* and *Goff* cases and that Quadra "discussed litigation strategy and engaged in privileged attorney client communications" with San Francisco Deputy City Attorneys. *Id*. (citing Ackiron Decl. ¶ 5). Ackiron does not provide a single detail about the documents and information to which Quadra had access or the attorney-client privileged communications in which he participated. Ackiron's general assertions are insufficient to establish that any specific communication to which Quadra was a party was protected by the attorney-client privilege, let alone that the common interest doctrine applied to protect against waiver of the privilege. *See, e.g., Vasudevan Software, Inc. v. IBM Corp.*, No. 09-5897-RS (PSG), 2011 WL 1599646, at *1 (N.D. Cal. Apr. 27, 2011) (the attorney-client privilege is "narrowly and strictly construed" and the party asserting it "bears the burden of proving that it applies" (citations omitted)).[5] Defendants' vague presentation fails to address the fundamental question: exactly what confidential information did Quadra learn in *Tennison* and *Goff* that he could use against Defendants in this case?

Defendants' presentation falls short in other ways. "[S]uccessive representations will be 'substantially related' when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution,

---

[5] Defendants also cite three examples of entries in Quadra's law firm's bills to San Francisco. While Defendants do not expressly cite these or any other entries in support of their common interest doctrine argument, the court reviewed them to determine whether they support invocation of the attorney-client privilege and anti-waiver exception. Defs.' Mot. 1-2 (citing Osborn Decl. ¶ 11 Ex. E at ECF pp. 16, 38, 65). The three examples, all entries by Quadra, reference emails and/or conferences with the San Francisco City Attorney's office regarding "status and strategy" or settlement strategy. Quadra addresses each of the examples in his declaration, stating that he did not receive "confidential information about the City" in connection with any of the tasks described in the entries. Quadra Decl. ¶¶ 13-15. The court concludes that the three billing entries do not satisfy Defendants' burden to show that Quadra owed a duty of confidentiality to San Francisco in connection with his representation of Sanders and Hendrix that is jeopardized by Quadra's representation of Caldwell.

The court takes this opportunity to note that Exhibit E to the Osborn Declaration is 116 pages long and contains numerous individual bills from Quadra's former firm to San Francisco. Although Defendants cite three individual entries within the bills in their motion, they do not provide accurate pinpoint citations to any of them, which forced the court to comb through the entire exhibit in order to locate and review the entries referenced in their motion. The court points this out now with the expectation that counsel will do a far better job in upcoming filings.

settlement or accomplishment of the current representation given its factual and legal issues." *Jessen*, 111 Cal. App. 4th at 713.  Defendants' argument on these points is superficial at best.  The similarities between the *Tennison* and *Goff* cases and Caldwell's case are that they involve allegations of wrongful conduct by SFPD officers resulting in wrongful convictions against Black men around the same period of time (the late 1980s).  The similarities end there.  The plaintiffs, individual defendants, investigators, prosecutors, crimes at issue, and defense attorneys are all different.  The legal issues are also dissimilar; *Tennison* and *Goff* involved *Brady* violations and allegations that officers pressured a witness to give false testimony, and this case involves fabrication of evidence.  Given the manifest differences between the cases and Defendants' utter lack of specificity, there is nothing in the record to support the conclusion that material confidential information obtained by Quadra in his representation of Sanders and Hendrix is also material to his current representation of Caldwell.

Defendants' various other points are similarly unconvincing.  The fact that San Francisco indemnified Quadra's clients in *Tennison* and *Goff* says nothing about whether Quadra obtained confidential information during the defense of those cases that could now harm Defendants.  Ackiron's pronouncement that Sanders and Hendrix "asserted no separate liability defenses that created any adversarial relationship" between them and San Francisco is contradicted by Quadra's assertions that other defendants in *Tennison* and *Goff* were casting blame on Sanders and Hendrix for any constitutional violations, and that his clients also were at odds with San Francisco on significant factual issues.

In sum, Defendants have failed to satisfy their "heavy burden" to show that disqualification of Quadra is warranted.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to disqualify is denied.

**IT IS SO ORDERED.**

Dated: January 25, 2021



_____
Donna M. Ryu
United States Magistrate Judge