UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE CALDWELL,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SAN FRANCISCO, et al.,<br><br>    Defendants. | Case No. 12-cv-01892-DMR<br><br>**ORDER GRANTING DEFENDANTS' MOTION IN LIMINE NO. 18**<br><br>Re: Dkt. No. 549 |

Plaintiff Maurice Caldwell retained Martin Cunniff to "analyze Mr. Caldwell's earning capacity had he not been wrongfully convicted, and to calculate the economic loss that Mr. Caldwell incurred due to his wrongful conviction . . . ." [Docket No. 654-6 ("Cunniff Expert Report") at 2.] Defendants move to exclude Cunniff's testimony entirely. [Docket No. 549 ("MIL").] Caldwell opposes. [Docket No. 640 ("Opp.").]

For the reasons stated below, Defendants' motion is granted, contingent on Defendants' ability to reach agreement with Plaintiff on proposed language to be read to the jury regarding the parties' positions on the cost of therapeutic services reduced to present value.

**I.   BACKGROUND**

Cunniff's report offers these five opinions:

    1.    "Maurice Caldwell suffered total past economic damages from loss of earnings capacity because of his wrongful incarceration and imprisonment in the range of **$3,209,976 to $6,651,259** including prejudgment interest; if prejudgment interest was not included, then the range would be **$1,681,909 to $3,515,225**."

    2.    "Maurice Caldwell has suffered total future economic damages from loss of

|   |   |   |
|---|---|---|
| | | earnings capacity because of his wrongful imprisonment in the range of **$1,012,918 to $2,035,397** after adjustment to present value, and a loss in the range of **$293,854 to $423,102** for impaired Social Security retirement benefits." |
| | 3. | "Maurice Caldwell has suffered lost investment earnings from retirement accounts in the amount of **$601,919**." |
| | 4. | "[T]he cost for Mr. Caldwell for the psychotherapeutic services which Prof. Paul Abramson has determined are necessary for Mr. Caldwell, reduced to present value, is **$415,366**." |
| | 5. | "Maurice Caldwell has suffered hedonic damages for the loss of ability to enjoy life because of his wrongful conviction in the amount of **$749,400**." |

Cunniff Expert Report at 2 (emphasis in original).  With respect to the first and second opinions, Cunniff explains that a loss of earnings capacity calculation is appropriate where a plaintiff has a lack of established work history. *Id.* at 5.  Cunniff states that his calculations look at "the earning capacity of career choices that the plaintiff had a reasonable probability of achieving." *Id.*

Cunniff was instructed by Caldwell's counsel to assume that Caldwell had a reasonable probability of pursuing at least three careers if he had not been incarcerated: (a) carpenter; (b) insurance salesperson; and (c) construction manager.  Cunniff Expert Report at 2; *see* Opp. at 2. Cunniff then calculated the estimated earnings for individuals in these professions over the period that Caldwell was incarcerated to reach his ultimate opinions about Caldwell's damages for loss of earnings capacity.  Cunniff acknowledges that at the time of Caldwell's 1990 imprisonment, he "had not selected a career, and had worked occasionally as a warehouseman and as a carpenter but did not have an established work history in any occupation."  Cunniff Expert Report at 5.

On March 11, 2021, the court ordered Caldwell to file an offer of proof that "discloses all admissible foundational facts supporting the underlying assumptions Cunniff used to calculate Plaintiff's economic damages based on the identified professions," including a detailed explanation about how that information will be offered into evidence.  [Docket No. 685.]  Caldwell responded on March 16, 2021.  [Docket No. 703.]  The court determined that the filing went "far beyond the

2

United States District Court
Northern District of California

court's order" because it included "additional legal argument and citations [and] additional argumentative analysis about how the anticipated evidence meets the cited legal standards." [Docket No. 705.] It accordingly struck the filing and ordered Caldwell to file an amended offer of proof, which he did on March 17, 2021. [Docket No. 707 ("Offer of Proof").] The court found that portions of the new filing "continue to contain improper argumentative analysis" and accordingly struck the argumentative portions of the offer of proof. [Docket No. 709.] The court accepted the portions of the offer of proof that were purely factual.

The offer of proof explains that Caldwell began working a paper route when he was 12 years old. Offer of Proof at 1. He then spent close to five years in the custody of the California Youth Authority and was discharged in August 1988. During the 2-year period from August 1988 to his arrest in September 1990, Caldwell was "constantly looking for work." *Id.* From about November 1988 to September 1990, he worked two to three days a week, for two to four hours per day, at a hair salon. *Id.* From February to July 1990 he worked full-time as a warehouseman and forklift operator. *Id.* Caldwell "regularly took on other short-term work when possible." *Id.* For approximately five months from October 1988 through February 1989, Caldwell worked full-time on several remodeling projects with a family friend who had a carpentry and contracting business. *Id.* He continued working with that individual on an intermittent basis until his arrest in September 1990. *Id.* at 2. He estimates that he worked on about ten different projects between March 1989 and September 1990, and that each project took between one to eight weeks. *Id.* Between July or August 1989 through November 1989, Caldwell worked full-time on carpentry projects with another family friend. *Id.* Caldwell took on several other miscellaneous day labor jobs when such opportunities arose, including janitorial work, carpentry, and painting. *Id.* While he was incarcerated, Caldwell worked as a porter and doing laundry and kitchen work. *Id.* at 3.

## II. LEGAL STANDARD FOR EXPERT TESTIMONY

Federal Rule of Evidence ("FRE") 702 governs testimony by expert witnesses. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. FRE 702 "contemplates a broad conception of expert qualifications," which may be obtained through "knowledge, skill, experience, training, *or* education." *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) (emphasis added). "In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." FRE 702, Advisory Committee Notes, 2000 Amendments (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). The standards outlined in *Daubert* apply to all expert testimony, not just testimony based in science. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156-57 (1999). However, "the rejection of expert testimony is the exception rather than the rule." FRE 702, Advisory Committee Notes, 2000 Amendments (citing cases). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

### III. DISCUSSION

Defendants move to exclude Cunniff's testimony on the basis that (1) he is not qualified to testify as an expert witness on Caldwell's earning capacity; (2) his methodologies regarding Caldwell's economic losses and hedonic damages are unreliable; and (3) his testimony is prejudicial and confusing.

#### A. Expert Qualifications

Cunniff is an attorney. He graduated from Loyola University in May 1983 with a bachelor's degree in business administration and from Frederic Levin College of Law in December 1989. Cunniff Expert Report, Ex. 1. He describes himself as a "[s]easoned litigator with over thirty years of extensive, in-depth experience in all types of business litigation including antitrust, intellectual

4

property, securities fraud, securities enforcement, consumer finance, and economic valuation issues." *Id.*, Ex. 1. He states that his career has focused on the calculation of damages, and as a litigator, he has handled "the damages case for hundreds of cases including approximately two dozen commercial trials and arbitrations." *Id.* at 3. Cunniff is the co-author and co-editor of a treatise on damages, "Calculating and Proving Damages," which was published by Law Journal Press in 2011. *Id.* Cunniff avers that he has read "hundreds, if not thousands, of cases, articles and economic analyses on damages" and has "kept up with developments in the field." *Id.*

Cunniff has made presentations at various law firms on "building the damages case in litigation." Cunniff Expert Report at 3. He has also taught damages-related courses at the FBI Academy in Quantico, VA, the FBI National Convention of Accountants, and training programs and conferences put on by the American Institute of Certified Public Accountants. *Id.* He has experience in "developing competency models to evaluate employees on their skills and aptitudes," although it appears that he has only applied those skills in evaluating lawyers. *Id.* Finally, Cunniff states that he has "been involved in working with hundreds of economists on various pieces of complex litigation." *Id.* Cunniff has never served as an expert witness in a lawsuit.

Defendants argue that Cunniff is not qualified to testify as an expert on Caldwell's loss of earning capacity. MIL at 5. They point out that Cunniff is a lawyer and that his experience assessing economic damages relates exclusively to his commercial litigation practice. *Id.* They assert that Cunniff is not a certified vocational rehabilitation counselor, a professional economist, a certified public accountant, or in any other profession qualified to testify about earning capacity. *Id.* at 5-6. Caldwell responds that Rule 702 "contemplates a broad conception of expert qualifications," and that experts do not need to have official credentials in the subject matter of their testimony in order to meet Rule 702 standards. Opp. at 3 (quoting *Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994)). He argues that Cunniff is an "experienced professional in the calculation of damages," is the co-author and co-editor of a peer-reviewed treatise on damages, and as a commercial litigator, has "investigated, evaluated, and presented damages in hundreds of cases." *Id.* at 3-4.

It appears undisputed that Cunniff's purported qualifications come from his experience

5

1 rather than any particular credentials. Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 (Advisory Committee Notes, 2000 Amendments). However, if an expert witness "is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* In evaluating a proposed expert's qualifications, the court looks not at the "qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Neither Cunniff's report nor Caldwell's opposition brief explain how Cunniff's experience as a commercial litigator is a sufficient basis for his opinions regarding loss of earning capacity in a wrongful imprisonment case. Cunniff testified in his deposition that he has only ever assessed earning capacity loss in the context of commercial litigation. Cunniff Depo. at 31:7-15. It is unclear whether any of the cases Cunniff worked on involved a similar analysis to the one he offers in this case—namely, loss of earnings capacity for an individual with minimal prior work experience. Cunniff has never completed a transferable skills analysis or analyzed labor market access. *Id.* at 31:4-9. He has only ever assessed vocational aptitude in a law firm environment assessing lawyer competencies. *Id.* at 30:11-23. He also did not consult with any other professionals in forming his opinions in this case, including any vocational rehabilitation counselors or economists. *Id.* at 60:6-15. It is not clear whether Cunniff has ever worked on any damages modeling outside of his role as a legal advocate in the area of commercial litigation.

Caldwell's primary argument on this point is that Cunniff is not testifying as a vocational rehabilitation counselor but instead only opining as to the quantum of damages. Opp. at 4. This argument is disingenuous and ignores Cunniff's report, which makes clear that he purports to have evaluated Caldwell's vocational aptitudes in order to formulate his opinions:

> California, and many other jurisdictions, uses a "reasonable probability" standard, i.e., using the earning capacity of career choices that the plaintiff had a reasonable probability of achieving. I have used the reasonable probability standard in conducting this analysis . . . .

6

> Based on my interview with Mr. Caldwell, review of his deposition transcript, information from his lawyers as to speaking engagements that Mr. Caldwell has had since his release, and information from a correctional officer who supervised Mr. Caldwell while he was incarcerated, I assume there is a reasonable probability that Mr. Caldwell could have followed at least the following careers had he not been incarcerated: (1) carpenter; (b) insurance salesperson; and (c) construction manager . . . .
>
> Based on my interview with Mr. Caldwell, he does have an aptitude for building things and was engaged in various jobs in prison that required manual dexterity, physical strength, and physical stamina. His public speaking and public testimony experience also support the existence of business skills and problem-solving skills. . . .
>
> [Caldwell's] decades-long battle against his wrongful conviction shows persistence and he clearly has a high energy level. His public speaking and public testimony experience show emotional intelligence and a desire to put the needs of others before his own. He is proficient with technology and likes to learn new technologies. . . .
>
> Mr. Caldwell does have excellent communication skills and has been able to work in teams during his time in prison. He indicated that he often became the team leader or manager in the jobs he had in prison.

Cunniff Expert Report at 5-7. As discussed more below, Cunniff also makes reference to a few websites to inform his opinions about Caldwell's vocational aptitudes. Cunniff's damages calculations rely on his evaluation of Caldwell's work-related experience and skills. It does not make sense to say that Cunniff is only testifying about the "quantum" of damages when that testimony relies on his explicit assessment of Caldwell's vocational aptitudes.

In sum, Caldwell has not established by a preponderance of the evidence that Cunniff is qualified to testify about the economic damages he suffered as a result of his wrongful conviction. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (stating that the proponent of witness testimony has the burden of establishing its admissibility by a preponderance of the evidence). Although (with one exception) the court excludes the entirety of Cunniff's testimony on the basis of Cunniff's qualifications, the court examines Cunniff's particular opinions below to further illustrate the disconnect between Cunniff's qualifications and the subject of his testimony, as well as to identify other serious problems that lead to the conclusion that his opinions should be excluded.

**B. Methodology**

**1. Past and Future Economic Damages**

Cunniff's first and second opinions relate to Caldwell's total past and future economic damages from loss of earnings capacity. As explained above, Caldwell's attorneys instructed Cunniff to assume that Caldwell could have pursued a career as a carpenter, insurance salesperson, or construction manager. Opp. at 2. Cunniff has no background as a vocational expert, did not consult with any vocational experts, and did not rely upon any well-established vocational texts such as the Dictionary of Occupational Titles ("DOT"). Instead, Cunniff "tested" this assumption by interviewing Caldwell for about an hour on the phone. Opp. at 2; *see* Cunniff Depo. at 62:23-63:14. Based on that interview, information from Caldwell's attorneys' about the speaking engagements Caldwell has had since his release, and (unspecified) information from Christopher Buckley, Cunniff determined that there was "enough evidence for [him] to make a reasonable assumption that there is a reasonable probability that Mr. Caldwell could have pursued a career" in any of those three professions. *See* Cunniff Expert Report at 6-7. To explain what skills those three careers require, Cunniff cites various websites, including Truity (a publisher of online personality and career tests), Investopedia (a website providing information and advice about the financial market), and Construction World (a website for news and resources relating to the construction industry). Cunniff Expert Report at 6-7. For example, Investopedia states that insurance agents must have good people skills and emotional intelligence.[1] Cunniff opines that Caldwell has those skills based on his public speaking experiences following his incarceration. *Id.* at 7.

Under FRE 703, expert opinions may be based on facts or data that are derived from three possible sources: (1) "firsthand observation of the witness with opinions based thereon traditionally allowed" (e.g., an opinion by a treating physician); (2) evidence presented at trial; and (3) "presentation of data to the expert outside of court and other than by his own perception." Fed. R. Evid. 703, Advisory Committee Notes. Although the facts or data underlying an expert's opinion

---

[1] Investopedia, *8 Qualities That Make a Good Insurance Agent*, https://www.investopedia.com/financial-edge/1212/8-qualities-that-make-a-good-insurance-agent.aspx (last accessed March 30, 2021).

8

need not be admissible, they must be the kind that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." Fed. R. Evid. 703.  The Ninth Circuit has recognized that experts cannot insert non-existent facts into the record through their expert reports. In affirming a district court's decision to exclude expert testimony at summary judgment, the Ninth Circuit cautioned that "[a] party's own speculation is insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 857 (9th Cir. 2019); *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)  ("[A]n expert report cannot be used to prove the existence of facts set forth therein.").  Thus, courts have rejected attempts to use experts as mere "conduits" for otherwise inadmissible evidence.  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("Although the Rules permit experts some leeway with respect to hearsay evidence, . . . a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." (cleaned up)).  For example, in *United States v. Mejia*, the expert witness whose testimony was challenged "identified hearsay as the source of much of his information."  545 F.3d 179, 197 (2d Cir. 2008).   The Second Circuit determined that at least part of the witness's testimony inappropriately "involved merely repeating information he had read or heard" without an explanation of "how he had pieced together bits of information from different sources and reached a studied conclusion that he then gave the jury."  *Id.* at 197-98.  Accordingly, expert witnesses may not simply repeat hearsay without "bring[ing] their expertise to bear" on it.  *Marvel Characters, Inc.*, 726 F.3d at 136; *see Wi-LAN Inc. v. Sharp Elecs. Corp.*, ___ F.3d ___, 2021 WL 1257074, at *7 (Fed. Cir. Apr. 6, 2021) (rejecting a party's attempt to use expert testimony as a "backdoor" to "allow the admission into evidence of otherwise inadmissible declarations and other materials").

In this case, Cunniff's analysis is not proper expert testimony.  He is not a vocational expert. His sources about job skills are non-scholarly websites with no clear indication of how the cited material was developed or on what expertise.  Cunniff did not consult any of Caldwell's records, including standardized test scores, employment records or educational history.  Cunniff did not administer any vocational tests or rely on the testimony of a vocational expert.  Instead, Cunniff's

9

aptitude assessments are based on Caldwell's self-reported skills, information from Caldwell's attorneys, and unidentified opinions offered by Buckley. Many of those facts do not otherwise appear in the record. There is no indication of how Cunniff applied his purported expertise to synthesize or analyze the facts upon which he relied. Thus, instead of offering his own opinions, Cunniff is essentially functioning as a "mouthpiece of the [individuals] on whose statements or opinions [he] purports to base his opinion." *Wi-LAN Inc.*, ___ F.3d ___, 2021 WL 1257074, at *6. Accordingly, Cunniff's testimony as to Caldwell's ability to perform in any of the identified positions is not "specialized knowledge" that will "help the trier of fact to understand the evidence or to determine a fact in issue" and must be excluded. *See* Fed. R. Evid. 702(a).

Caldwell's arguments to the contrary are not persuasive. First, Caldwell argues that "Defendants do not present any evidence to support their assertions that Mr. Cunniff's methodology is flawed," such as "learned treatises or professional literature critiquing his methodology." Opp. at 5. This argument turns the burden of proof for admissibility on its head, since the proponent must show by the preponderance of the evidence that testimony offered is admissible. *See Bourjaily*, 483 U.S. at 175-76. Thus, it is Caldwell's burden to show that the methodologies Cunniff employed are reliable. As explained above, Cunniff does not apply specialized knowledge in analyzing the facts underlying his opinion. He also does not provide any information about how experts usually analyze loss of earnings capacity for people like Caldwell who did not have significant prior earnings.[2]

Second, Caldwell argues that Defendants' concerns go to the weight of the evidence rather than its admissibility. *See* Opp. at 5. He cites *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.* for the proposition that "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." 738 F.3d 960, 969 (9th Cir. 2013). However, that case also says that the district court is "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."

---

[2] Cunniff provides several factors for calculating earning capacity generally, including work-life expectancy, actual or mitigating earnings, the present value of the net earnings loss, and the personal consumption expenditures that were "saved" because of the occurrence leading to the loss. Cunniff Expert Report at 5-6. However, Cunniff does not point to any authorities that explain how to calculate loss of earnings capacity for someone without significant prior work experience.

*Id.* at 969-70. It is not helpful for the jury to hear what a carpenter, insurance salesperson, or construction worker could have made over the course of 20 years if there is not a proper foundation, expert or otherwise, that Caldwell had the reasonable ability to pursue those careers. Cunniff is not a vocational expert, and his report does not lay out a proper factual basis for his assumption that Caldwell could have pursued each of the identified professions. Caldwell's offer of proof does little to shed light on these issues. While it does discuss unspecified carpentry projects and other miscellaneous jobs Caldwell completed during a relatively short time period, it does not explain any of the specific skills that he developed, and does not offer a sufficient basis for Cunniff's assumption that Caldwell could have immediately began full-time employment as a professional carpenter.[3] It contains virtually no factual basis for the insurance salesperson and construction manager assumptions. While Caldwell will have the opportunity to offer his own testimony about his work-related skills and experiences, there is not a sufficient foundation for expert testimony about earnings capacity in the three specific skilled professions discussed by Cunniff.

Third, Caldwell asserts that Cunniff is opining about Caldwell's loss of earnings capacity rather than actual lost earnings. The difference, he explains, is that a plaintiff does not have to prove what he *would* have made absent an injury (e.g., based on past earnings history) but only what he *could* have made. *See* Opp. at 7-9. Caldwell relies mainly on *Licudine v. Cedars-Sinai Med. Ctr.* to explain how to calculate loss of earnings capacity. Opp. at 9; *see* 3 Cal. App. 5th 881, 894 (2016). That case states that such damages are calculated based on what the plaintiff was "capable of earning, rather than what he was actually earning" and so "proof of the plaintiff's prior earnings, while relevant to demonstrate earning capacity, is not a prerequisite to the award of these damages." *Id.* at 893. In *Licudine*, the court examined at length how the jury is supposed to decide which careers are "available" to the plaintiff and determined that the jury must look at career choices that the plaintiff had a "reasonable probability of achieving." 3 Cal. App. 5th at 894.

---

[3] The DOT uses a Specific Vocational Preparation ("SVP") rating that indicates the amount of training or experience an individual needs to perform their job at an average performance level. Carpentry has an SVP rating of 7, indicating skilled work. *See* DOT 860.381-022. Cunniff did not provide an analysis of how Caldwell's past experience working intermittently for family friends would immediately qualify him for skilled labor as a carpenter.

*Licudine* actually cuts against the admissibility of Cunniff's testimony. As Caldwell acknowledges, he had a minimal work history before his incarceration. *Licudine* notes that where a plaintiff does not have a prior work history (such as for a young plaintiff), courts have "fixed the lost earning capacity as the average salary of all workers in the workforce," under the assumption that it was reasonably probable that the plaintiff was fit to do *something* in the workforce. 3 Cal. App. 5th at 896. "However, where a young plaintiff's injury prevents him or her from pursuing a *specific* career, courts have generally required some proof that the plaintiff is far along in his or her training or experience." *Id.* (emphasis added). Here, Cunniff is not just offering testimony about the average earning capacity across the entire workforce; he analyzes Caldwell's damages based on three specific professions. There is nothing in the record establishing that Caldwell had any training or experience in construction management or insurance sales, and insufficient evidence that Caldwell could have instantly qualified as a full-time professional carpenter based on his work experiences with family friends. Notably, in *Licudine*, the court determined that the plaintiff had not presented sufficient evidence that she could have become qualified to earn a lawyer's salary even though she was about to start law school before she was injured. *Id.* at 899 ("Absent from the record is any evidence of her likelihood of graduating from Suffolk Law School, her likelihood of passing the Bar, or her likelihood of obtaining a job as a lawyer."). Caldwell does not cite any cases where a court permitted expert testimony about earnings capacity for specific professions based on cursory assumptions about a plaintiff's ability to pursue those professions. *Licudine* and the other cases cited by Caldwell only establish that damages for loss of earnings capacity can be awarded, not that testimony like Cunniff's is reliable to establish the amount of such damages.[4]

In sum, Cunniff starts from minimally supported assumptions to extrapolate significant and specific economic damages. His speculative testimony does not meet the minimum standards

---

[4] Cunniff's opinion about impaired social security retirement benefits is similarly flawed because it relies upon the same vocational assumptions.

Caldwell requests that the court allow Cunniff to testify, at minimum, about the earnings of a warehouseman or janitor (the professions Defendants identify as those that Caldwell had a reasonable probability of achieving) or as to the average salary of all workers in the workforce. [Docket No. 703 at 8.] The court denies this request. Caldwell may not bring in last minute expert testimony for which there is no expert report and no opportunity for Defendants to examine or rebut.

required for expert opinions. *See Stephens*, 935 F.3d at 856 ("[An] expert's opinion must rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation." (quoting Fed. R. Evid. 703)). Accordingly, Caldwell has not established that Cunniff's testimony regarding his loss of earnings capacity for specific, skilled professions is "based on sufficient facts or data" or "the product of reliable principles and methods." *See* Fed. R. Evid. 702.

### 2.     Lost Investment Income

Another example of an opinion disconnected from a factual basis is Cunniff's opinion that "Caldwell has suffered past economic damages from loss of investment income on retirement savings because of his wrongful imprisonment in the amount of $601,919." Cunniff Expert Report at 11. He states, "Like most American workers, I assume Mr. Caldwell would have invested in a retirement account like a 401K retirement savings account." *Id.* Cunniff also assumes a $500 per month investment increased by the inflation rate to reach his damages calculation.

Cunniff provides no support for his factual assumptions. He does not cite any evidence showing that "most American workers" have a 401k or other retirement savings, or that it is reasonable to assume that Caldwell (or an average worker) would or could invest $500 per month in such an account even if he had one. Further, his report assumes without support that Caldwell would have started investing $500 per month in retirement savings *in 1991*, which (based on the minimal amount of evidence about Caldwell's pre-incarceration employment) is entirely speculative.

Cunniff's unsupported speculation about Caldwell's lost investment income is indicative of his unreliable methodology and provides further support for the exclusion of his testimony.

### 3.     Hedonic Damages

Cunniff's opinion on hedonic damages suffers from a flawed methodology. Hedonic damages are based on "the loss of the pleasure of being alive." *Mark H. v. Lemahieu*, 513 F.3d 922, 930 n. 6 (9th Cir. 2008) (quoting Black's Law Dictionary 417 (8th ed. 2004)). Cunniff opines that Caldwell suffered hedonic damages because of his wrongful imprisonment in the amount of $749,400. Cunniff Expert Report at 12. Cunniff reaches this figure by examining the cost of "pay-

13

to-stay" jails, which allow incarcerated people who can afford it to pay for a safer, cleaner facility. *Id.* Prices for these paid options vary by city, usually in the range of $75-$251 for California jails, but Cunniff settles on a rate of $100 per day as a "useful proxy for how much a consumer would pay to still 'enjoy life' while incarcerated." *Id.* He states that it is a conservative price because presumably people would be willing to pay more to avoid jail altogether. *Id.* He calls this kind of calculation a "real world" market experiment. *Id.* Cunniff concludes that Caldwell's hedonic damages are $100 per day multiplied by the 7,494 days he was wrongfully imprisoned, for a total of $749,400.

Some courts have entirely excluded expert testimony on the issue of hedonic damages. A number of courts have rejected such testimony as scientifically dubious because it attempts to quantify, as a scientific matter, the value of an average human life. *See, e.g.*, *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000) ("[F]ederal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of [hedonic] damages inadmissible.") (citing cases); *Rascon v. Brookins*, 2018 WL 739696, at *6 (D. Ariz. Feb. 7, 2018) (rejecting an expert economist's hedonic calculations as "too speculative and unconnected to how an individual values their life"); *McMullin v. United States*, 515 F. Supp. 2d 914, 924 (E.D. Ark. 2007) (finding that expert calculations on hedonic damages do not meet the *Daubert* standard because they are "attempting to quantify something which cannot truly be determined" (cleaned up)); *Crespo v. City of Chicago*, 1997 WL 537343, at *2 (N.D. Ill. Aug. 22, 1997) ("The area of hedonic damages does not appear to survive scrutiny under th[e *Daubert*] framework."). Other courts have determined that expert testimony about hedonic damages is not helpful to the jury because jurors can decide based on their own experience what value to attach to such loss. *See Davis v. ROCOR Int'l*, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002) ("[T]he jury, composed of laypersons who presumably value their own life and loved ones, is equally equipped to place a quantitative value on . . . companionship, affection and society should the case call for such a determination." (cleaned up)); *Est. of DuBose v. City of San Diego*, 2002 WL 34408963, at *2 (S.D. Cal. Oct. 1, 2002) ("[T]he jury will have the knowledge and life experience to determine a fair damages award based upon the testimony received at trial."); *Crespo*, 1997 WL 537343, at *3

14

("We presently are of the opinion that the jury is able to decide for itself, without the assistance of an economics expert, the value that our society places on a human life.").

Courts have been particularly skeptical of the methodology employed by Cunniff here, which is a "willingness-to-pay" method of calculating hedonic damages. *See, e.g.*, *Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 388 (W.D. Mich. 1996) ("The willingness to pay model on the issue of calculating hedonic damages is a troubled science in the courtroom, with the vast majority of published opinions rejecting the evidence.") (citing cases); *Est. of DuBose*, 2002 WL 34408963, at *2 (S.D. Cal. Oct. 1, 2002) ("The willingness-to-pay evidence would not assist the jury in a way more meaningful than would occur if the jury asked a group of wise courtroom bystanders for their opinions." (cleaned up)). The court in *Ayers v. Robinson* determined that several considerations "go a long way toward undermining the basic premise behind the willingness-to-pay model," including "(1) the assumption that people have freedom of choice in deciding to confront risk, (2) the assumption that people perceive risk accurately, (3) the nonmonetary factors that drive many consumer purchases (e.g., advertising) and employment decisions (e.g., civic pride), and (4) the political aspects of government regulation (e.g., budgets, lobbyists)." 887 F. Supp. 1049, 1063 (N.D. Ill. 1995). These basic criticisms highlight that there are many factors that influence a certain market, like "pay-to-stay" jails, that have nothing to do with an accurate valuation of an individual's enjoyment of life.

Accordingly, the court finds that a "willingness-to-pay" model of calculating hedonic damages is not "the product of reliable principles and methods" sufficient to pass muster under the Federal Rules of Evidence or *Daubert*. *See* Fed. R. Evid. 702.

**IV.  CONCLUSION**

For the reasons stated above, the court finds that Cunniff is not qualified to offer expert testimony about Caldwell's lost earnings capacity damages. Cunniff is not qualified as a vocational expert, yet his economic damage calculations rest upon pseudo-vocational opinions. His report relies on speculative factual assumptions and attempts to "backdoor" facts that do not exist and are not expected to be elicited at trial. He uses unsupported methodologies. All of these problems independently warrant exclusion. Cunniff's testimony is therefore excluded almost in its entirety.

Cunniff's opinion 4 regarding the present value cost for psychotherapeutic services which Prof. Paul Abramson determined to be necessary appears to fall within Cunniff's expertise, and rests on a sufficient factual basis and methodology. It makes little sense for Cunniff to be called to testify on this single relatively simple matter. The court orders the parties to meet and confer to agree upon a statement to be read to the jury on the facts to which Cunniff and the opposing expert would testify on this subject. The parties shall file a joint statement to this effect by **April 22, 2021**.

Defendants' expert Reg Gibbs provided a rebuttal report to Cunniff's testimony and Caldwell's expert Halford Fairchild wrote a reply to Gibbs' testimony. The parties filed respective motions to exclude the testimony of these experts. *See* Docket No. 580, Plaintiff's Motion in Limine No. 4; Docket No. 538, Defendants' Motion in Limine No. 7. Because Cunniff's testimony is largely excluded, the rebuttal and reply opinions addressing that testimony are also excluded and the corresponding motions are therefore denied as moot.

**IT IS SO ORDERED.**

Dated: April 13, 2021



_____
Judge Donna M. Ryu
United States Magistrate Judge